**RODGERS et al. v. FLEMING et al.** *
(No. 848–4923.)

Commission of Appeals of Texas, Section B.
Feb. 29, 1928.

**1. Wills ⬤⇒282—Insane delusions affecting testamentary capacity need not be specially pleaded.**

In contest of will, insane delusions as affecting testamentary capacity need not be specially pleaded, but temporary insanity or insane delusions may be proved under general allegation of want of capacity.

**2. Wills ⬤⇒38(2)—Insane delusions are not ground for contesting will, except as showing want of testamentary capacity.**

Insane delusions are not within themselves ground of attack against probating of will, except as they show want of testamentary capacity.

**3. Wills ⬤⇒396—Objection to charge, to merit consideration on appeal, must be presented in statutory manner (Rev. St. 1925, art. 2185).**

Objection to charge in will contest, to merit consideration on appeal, must have been presented in manner and at time required by Rev. St. 1925, art. 2185.

**4. Wills ⬤⇒396—In will contest, requested instruction as to insane delusions held sufficient objection to charge defining mental incapacity, to merit consideration on appeal (Rev. St. 1925, art. 2185).**

In contest of will, requested instruction as to insane delusions *held* sufficient objection, under Rev. St. 1925, art. 2185, to charge given defining mental incapacity, which was only issue submitted, to require consideration by trial court and review on appeal, since it plainly requested that court add to definition, which was otherwise unobjectionable, instruction concern-

---

⬤⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Rehearing denied May 2, 1928.

ing mental delusions which became part of is- sue under pleadings.

**5. Trial ⬅⮞277—Bill of exceptions duly approved would be appropriate method to preserve oral objections to charge (Rev. St. 1925, art. 2185).**

Rev. St. 1925, art. 2185, does not require that objections to charge be in writing, and therefore permits them to be made orally, and bill of exceptions duly approved would be appropriate method to preserve oral objections.

**6. Statutes ⬅⮞243—Court must give such reasonable and liberal interpretation to statute relative to objections to charge as will effectuate its clear purpose (Rev. St. 1925, art. 2185).**

Since purpose of Rev. St. 1925, art. 2185, relative to objections to court's charge, is clear, court must give such reasonable and liberal interpretation to statute as will best effectuate such purpose.

**7. Wills ⬅⮞330(2)—In will contest, evidence held to raise issue of insane delusions, requiring giving of requested instruction relative to such delusions.**

In contest of will, evidence that testator erroneously believed that nephew had caused family great deal of trouble, and that astronomers would some day see through gates of heaven, *held* sufficient to raise issue of insane delusions, requiring the giving of requested instruction relating to insane delusions.

Error to Court of Civil Appeals of Sixth Supreme Judicial District.

Application by Morris Fleming and another for the probate of the will of W. J. McDonald, deceased. A decree probating the will was affirmed (295 S. W. 326), and Florence Rodgers and others, contestants, bring error. Reversed and remanded.

A. P. Park, Sturgeon & Sturgeon, and Patrick & Eubank, all of Paris, Harrison, Woodruff & Holloway, of Brownwood, Phillips, Townsend & Phillips, of Dallas, and Rodgers & Rodgers, of Texarkana, for plaintiffs in error.

Claude Pollard, Atty. Gen., and Tom L. Beauchamp, Hutchison & Hutchison, Long & Wortham, and W. F. Moore, all of Paris, for defendants in error.

SPEER, J. This most interesting case arises over the contest of the will of W. J. McDonald, sought to be probated in Lamar County. The will was ordered to be probated in the county court, and likewise on appeal in the district court, and the latter judgment was affirmed by the Court of Civil Appeals for the Sixth District. 295 S. W. 326.

The residuary clause of the will is as follows:

"5. All the rest, residue and remainder of my estate I give, devise and bequeath to the regents of the University of Texas, in trust, to be used and devoted by said regents for the purpose of

aiding in erecting and equipping an astronomical observatory to be kept and used in connection with and as a part of the university for the study and promotion of the study of astronomical science. This bequest is to be known as the W. J. McDonald observatory fund. As soon as my executors shall have paid off all charges against my estate, settled with all legatees and have the estate in shape to turn over the residue to the regents, they shall do so, using only such time to accomplish this as in their judgment is necessary, reasonable and proper. Upon receipt of such residue the regents shall proceed at such time and manner as in their judgment may seem best to execute the trust and they shall have full power and authority to administer and handle the same for the purpose of carrying out its purpose and objects, and in so doing they may apply all or any part of the income from the bequest and all or any part of the corpus of the bequest as they may deem proper to use towards such erecting and equipping the observatory, it being my intention that the regents shall have full power and authority to handle, use and appropriate this bequest, corpus and all accrued income in such manner as to them may seem best in order to carry out the object of the bequest, the only limitation on their authority and power being that the bequest is intended solely for the use and benefit of an astronomical observatory in one or all the ways hereinbefore mentioned. The regents shall have the power to sell any real estate at any time.

"All investments are to be made in such bonds and securities as are prescribed by law for the investment of the state common school fund.

"In handling the notes due my estate the regents are requested to use the utmost liberality and lenience in the matter of renewals and extensions consistent with safety."

Plaintiffs in error in their contest deny generally the allegations of the application for probate, and plead that:

"On the 8th day of May, 1925, the date of making said purported will, and prior thereto and up to and including the 8th day of February, 1926, the day of his death, W. J. McDonald, deceased, did not have testamentary capacity to make a will; was of unsound mind; and did not have mental capacity to know, understand, and appreciate the character, amount, and extent of his property or the objects of his bounty, or the real disposition he was making, or attempting to make, of his property by the instrument offered for probate."

The case was submitted upon a single special issue, as follows:

"Did or did not W. J. McDonald have testamentary capacity on May 8, 1925, at the time he executed the will in controversy?"

Accompanying the issue was an instruction defining "testamentary capacity," as follows:

"To make a valid will, the person making the will must have testamentary capacity at the time of the execution of the will. By testamentary capacity is meant that the person at the time of the execution of the will has suffi-

---

⬅⮞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

cient mental ability to understand the business in which he is engaged, the effect of his act in making the will, and the general nature and extent of his property. He must also be able to know his next of kin and the natural objects of his bounty. He must have memory sufficient to collect in his mind the elements of the business to be transacted and to hold them long enough to perceive at least their obvious relation to each other, and to be able to form a reasonable judgment as to them."

The contestants requested the following special charge:

"If at the time of the execution of the will by W. J. McDonald on May 8, 1925, he was under the influence of an insane delusion or delusions affecting the disposition of his property which he was making, then you are instructed that he did not at said time have testamentary capacity. An insane delusion is the belief of the existence of a state of supposed facts which no rational person would have believed."

The case turns upon the correctness of the trial court's ruling in refusing this instruction.

[1] To the assignments presenting this question, it is first contended by defendants in error that the instruction was properly refused, because there was no pleading by the contestants to justify its being given. Some of the contestants who intervened in the case did specially plead insane delusions of the deceased, but so pleaded the matter as to limit that issue (if it is a separate issue) to specific delusions. The evidence was much broader than this plea, and the instruction, it will be observed, is as broad as the evidence. The original contestants did not plead insane delusions, as such, at all. So that we are put to the decision of the question whether or not insane delusions, as affecting the deceased's testamentary capacity, must have been specially pleaded.

There is respectable authority, and perhaps excellent reason, for holding that such a plea is necessary to support a recovery by a contestant upon that ground. But we are of the opinion the matter has been definitely settled otherwise in this state by authorities of such eminence as would forbid our departure at this time.

Vance v. Upson, 66 Tex. 476, 1 S. W. 179, involved the contest of a codicil changing a will which had been previously probated for want of testamentary capacity. The trial court, among other things, instructed the jury as follows:

"If however, he had not the qualities or capabilities above enumerated, or if, at the time, he was laboring under an insane delusion, either in regard to his property, or the natural and proper objects of his bounty, which affected the disposition he was attempting to make, or of which delusion the papers were the offspring or fruit, then such a person was not in a condition to make a valid will, and a will propounded under those circumstances ought to be set aside, and held for naught."

The Supreme Court, through Justice Stayton, said of the charges:

"These charges presented the real issues made by the evidence as well as the pleadings in the case."

The opinion does not disclose what the pleadings were, but an examination of the original record in the office of the clerk of the Supreme Court discloses that the contestants pleaded:

"That, at the time the same purports to have been written, the said James Vance (the testator) was insane and not capable of making a lawful will."

The pleadings did not otherwise plead the want of testamentary capacity.

Prather v. McClelland, 76 Tex. 574, 13 S. W. 543, was likewise a will case, where the contest was upon the ground of want of testamentary capacity. In that case the court charged the jury:

"2. To find this will or codicil valid the testator must have been of sound mind at its execution, and by this is meant that he must have been capable of understanding the nature of the business he was engaged in, the nature and extent of his property, the persons to whom he meant to devise and bequeath it, the persons dependent upon his bounty, and the mode of distribution among them; that he must have had memory sufficient to collect in his mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relations to each other, and be able to form a reasonable judgment as to them; and that he was not under the influence of an insane delusion, either in regard to his property or the natural and proper objects of his bounty, which affected the disposition he was about to make.

"3. If, however, he had not the qualities and capabilities above enumerated, or if at the date of the will or the date of the codicil he was laboring under an insane delusion, either in regard to his property or the natural and proper objects of his bounty, which affected the disposition he was then attempting to make, or of which delusion the papers were the offspring or fruit, then he was not at such time in a condition to make such will or codicil; and if you find this will or codicil propounded under such circumstances the instrument, if either, so propounded ought to be set aside, and as to it you will find against the proponents and in favor of the contestant, stating in your verdict plainly which, if either or both, you so find should be set aside.

"4. By insane delusion is meant the belief of a state of supposed facts which no rational person would believe."

The court said:

"With regard to all other assignments upon charges given and refused, we deem it sufficient to say that we think the charges given were substantially correct, and in so far as the charges refused embraced correct propositions proper to be given, that they were sufficiently embraced in the charges given."

Here again the opinion does not disclose the pleadings. But an examination of the

original transcript shows that the contestant alleged that "said pretended codicil is void for want of capacity in the testator to execute the same at the time its pretended execution was effected." There was no attempt to plead insane delusions as such.

[2] Insane delusions are not within themselves a ground of attack against the probating of a will, except as they show a want of testamentary capacity. In other words, the real defense is want of testamentary capacity, whether such want of capacity is produced by ordinary and. complete insanity, or by temporary aberrations or insane delusions. The real vice, from a judicial standpoint, in either case that vitiates the instrument, is want of capacity. So that, where want of capacity is pleaded as ground of contest, though general in the form of its expression, nevertheless that mental defect may be proven in any of the ways recognized by the law of evidence. Under such general allegation undoubtedly proof of temporary insanity or of insane delusions directly affecting the execution of the instrument in its material respects would be admissible. Such testimony was admitted in the cases above referred to and in this case. From this viewpoint there is much to be said for the holding that it is not necessary in any case to plead specifically that the want of testamentary capacity proceeded from insane delusions. Of course, a case might arise where, upon special exceptions being urged to the generality of the plea, the precise incapacity would have to be pleaded. But we have nothing of that kind before us.

[3, 4] It is further pointed out by defendants in error that, since no objections were filed by plaintiffs in error to the trial court's charge, under the statute all objections thereto were waived, and the assignment complaining of the refusal to give the requested instruction as to insane delusions cannot be sustained.

Article 2185 of the Revised Civil Statutes 1925 provides:

"The charge shall be in writing, signed by the judge, filed with the clerk, and shall be a part of the record of the cause. It shall be prepared after the evidence has been concluded and shall be submitted to the respective parties or their attorneys for inspection, and a reasonable time given them in which to examine and present objections thereto, which objections shall in every instance be presented to the court before the charge is read to the jury, and all objections not so made and presented shall be considered as waived. * * * "

Of course, it is plain that an objection to the charge to merit consideration on appeal must have been presented in the manner and at the time required by the statute. The requested instruction we are considering was not an independent issue, or an issue at all, within the meaning of the statute of special issues. It is more in the nature of a definition or explanation of terms used by the court in the submission of the issues. No objection or attack whatever was made upon the trial court's charge—neither the issue submitted or the instructions accompanying it—unless the requested instruction would constitute such objection. It is admitted by plaintiffs in error that the charge was correct "as far as it went," but it is contended the same was insufficient and defective, in that it was not full enough, and did not concretely apply the law to the facts of this case as shown by the evidence. The precise question of practice—whether or not such a request will constitute the objection required by the statute—has never been directly determined by the Supreme Court.

In Gulf, etc., Co. v. Dickey, 108 Tex. 126, 187 S. W. 184, this statute was carefully considered by the Supreme Court in an exhaustive opinion by Chief Justice Phillips. The question there arose upon the contention of the defendant in error that the statute of objections required a formal bill of exceptions to be taken. Referring to the statute of objections and to the statute dispensing with the necessity of a bill of exceptions to the charge, the court said:

"Construing the two articles together, the change worked in the law is to require that for errors in the general charge to be reviewable on appeal they must be brought to the court's attention before the charge is read to the jury; otherwise they are waived. Since in the passage of the act, article 1972 [Rev. St. 1911] was left intact by the Legislature, though it amended the two articles in the same chapter which immediately preceded it and the two succeeding articles, as well, it is evident, we think, that, in respect to the general charge, the concern of the Legislature was not directed to the subject of bills of exception. ·It is difficult to credit it with the purpose to change the ·law upon the .subject of the general charge being regarded as 'excepted to' without the necessity of any bill being reserved, when it is seen that by the amendatory act it left article 1972 untouched. As revealed by the terms of the amendatory act, the larger purpose of the Legislature, in relation to the general charge,. was to give the trial judge an opportunity to· correct any errors in his charge before giving it to the jury, so as to avoid new trials or reversals on that account. To accomplish this· purpose, the method devised was the requirement of amended article 1971, that all objections to the charge shall be presented to the court before it is read to the jury, upon the penalty of a waiver of the error. * * * An objection to the charge in the particular complained of must be presented to the trial judge before the charge is read to the jury, and that. when such objection is so made, it is the right of the complaining party to have the error considered by the appellate court, without the necessity of going through the formal procedure of reserving a bill of exception to the charge, inasmuch as article 1972 left unamended by the act, distinctly provides that no bill of exception to the charge is necessary for its revision on appeal on account of error."

While the provision of article 1972 discussed by the Chief Justice in that case is no longer a part of our statute, yet as it now exists there can be no doubt that the larger purpose of the Legislature was to require parties as a prerequisite to their right to complain of the charge given to present objections thereto to the trial court before he has read his charge to the jury to the end that he may be given an opportunity to correct the same. Whether the statute be considered as it existed when the Dickey Case was decided, or as it exists now, it is obvious the Legislature was not concerned with the specific form of the objection nor with the method of authenticating it, further, of course, than that it should be made properly a part of the record. It is significant that the statute does not even require that the objections should be stated in writing. It does not undertake to say how the proceeding shall be authenticated.

[5, 6] In the Dickey Case a written objection shown to have been overruled by the trial court and entered upon the minutes of the court was a sufficient authentication. Since the statute does not require the objections to be in writing, and therefore permits them to be made orally, where such objections are made orally, we have no doubt but that a bill of exceptions duly approved would be an appropriate method to preserve the objections. The purpose of the statute being clear, it is our duty, as indicated by the Dickey Case, to give that reasonable and liberal interpretation to the statute as will best effectuate such purpose. We think the requested instruction in this case, which was shown to have been timely presented to the trial court, was a sufficient objection to the charge given to require its consideration by the trial court and a review on appeal. The request was necessarily in its nature an objection to the court's charge in defining mental incapacity, the only issue submitted to the jury. It plainly requested the court to add to his definition, which was otherwise unobjectionable, an instruction concerning mental delusions, which we have seen became a part of the issue under the pleadings, and its presentation could mean nothing else than that the contestants requested a further definition of terms, and that the instructions given upon this point were deficient. The attention of the trial court was thus effectively and timely called to a defect in the charge as prepared by him, and every purpose of the statute was met, and no reason exists why the ruling may not be reviewed merely because the request was not accompanied by a formal objection to the charge given. The request was a substantial objection to the charge.

In view of the importance of the questions of pleading and practice above discussed, we have had free consultation with the Supreme

3 S.W.(2d)—6

Court, and that court is of the opinion that the questions should be determined as above indicated, and that there is no decision by the Supreme Court that would compel a contrary conclusion upon either question.

[7] This brings us to a consideration of the greatly contested question of whether or not the evidence raises the issue of insane delusions, making necessary the giving of the requested instruction. We have considered the testimony very carefully, in keeping with the importance of the question and the magnitude of the case, and have concluded that the evidence does raise the issue, and that the trial court and the Court of Civil Appeals erred in holding to the contrary. No useful purpose would be subserved by our discussing the testimony in detail, but a reproduction of the hypothetical question propounded by contestants to Dr. Guy F. Witt, a practicing physician, and a specialist in nervous and mental diseases, together with his answer, will show conclusively, we think, that the issue of want of mental capacity through insane delusions was raised by the testimony. The hypothetical question finds support in the statement of the evidence, and is as follows:

"Assuming that W. J. McDonald died on February 8, 1926, this year, he made a will which is in controversy here on the 8th of May, 1925, 9 months before he died. He was about 81 years old when he made the will, perhaps 82. He was a bachelor. He had been suffering with insomnia for many years, say, for more than 20 years. In 1912 he had some sort of bladder trouble, which required at that time the use of a catheter. In 1921 it was found that he had carcinoma of the prostate, a swollen and enlarged prostate carcinoma, and pus in the bladder. Several times after that other diagnoses were made, and it was found that he had the same trouble, carcinoma, plus pus in the bladder. From 1921 until he died he never voided his urine except by use of a catheter. During the latter part of his life, along about 1922, 1923, and 1924, he complained of having kidney trouble, no medical diagnosis to that effect, but he said he had it, complained of having sugar and pus in his urine. He had a way of analyzing his own urine, and analyzed it, and found pus and sugar in his urine. He was very cautious about his diet, said he could not assimilate sweets and starches. That some time in 1921 and 1922 he lived at the house of his brother, H. D. McDonald, and during that time Mrs. McDonald, H. D.'s wife, prepared his food. He did not eat the food that the members of the family ate; she prepared special food for him. After that, until 1925, he ate many of his meals, if not most of them, at her house, and she prepared them for him, omitting sweets and starches at his request. He complained of insomnia as stated. He complained of his eyesight. He complained of head aches, and during the latter two or three years of his life he was nervous and frequently irritable. He was interested in a bank at Clarksville, perhaps the largest stockholder. The president of the bank was a Mr. Bowers, who was his friend, and Mr. McDonald would go frequently to Clarksville, which is near here, 30 miles from here, and make suggestions as to the operation of the

bank. Mr. Bowers died in the fall of 1923, in October, 1923, and Mr. McDonald ceased to go over there, never went there after the death of Mr. Bowers, and, when asked by the son of Mr. Bowers why he did not come over—Mr. McDonald was very much attached to Mr. Bowers, and was very much grieved at his death—and later when Mr. Bowers' son asked him why he did not come over any more, he said it was because of the death of Mr. Bowers, the father. As time went on, and he approached the date of the making of the will, in 1923 certainly and some in 1924 he manifested indications of forgetfulness. For instance, a man came to his office one morning to settle a note he owed Mr. McDonald, and Mr. McDonald told him to come back at 2 o'clock p. m. It was a man whom he knew, and, when the man came back at 2 o'clock, Mr. McDonald did not recognize him, had forgotten him and the transaction, and let him go away without remembering him or recognizing him,—at any rate, the man came in there and waited around and Mr. McDonald let him go, let him go without recognizing him, and told his secretary shortly after he left to write him a letter to come back and settle the note, after she had called his attention to the fact that that was what the man came for and told him who it was. He had a little painted doll, five or six inches high, and he would sometimes sit for hours picking the paint off the doll with a pin, saying he was picking the clothes off his girl. A farmer came to him in March, just before the will was executed in May, and arranged with him to rent a farm from him. They discussed the terms of the deal and so forth. It was a man who had occasional dealings with Mr. McDonald, whom he had talked to and knew, and, after they had talked about it, Mr. McDonald told him to come back in July and wind it up, conclude it. He came back in July, and Mr. McDonald said he did not remember making any trade with him at all. The man insisted that he had, and Mr. McDonald insisted that he did not remember anything about the transaction. In making the deal Mr. McDonald had gone into some details about pulling stumps, ditching, and what he wanted done on the farm, and told him he was a young man, the man he would like for a tenant, the man whom he forgot in July. This was in March, 1925, and the will was made in May, 1925, and he forgot the tenant in July. Mr. McDonald was very much devoted to his brother, H. D. McDonald.

"Assuming that in December a man named Joe Hogan, the name of the man is not material, and another man went to Mr. McDonald, and in his office paid him $1,900, a loan he had against a certain piece of land, Mr. McDonald at that time signed the release of the lien, and delivered it to the parties. A few days after that, maybe the next day, or a few days after that, Mr. McDonald met this man Hogan on the street, and indicated in ways not necessary to go into that he had forgotten receiving payment of the note, and thought the man was still owing him, and that he had a lien on the land. Some time, possibly about 1923, along about there, perhaps 1924, he sent his secretary out, and she bought him the Scientific American, which had an article in it on Communion with the Dead. He had her read it to him, perhaps three times that day, and had her read it to him twice the next day again. He was devoted to his brother, H. D. McDonald. H. D. McDonald was a lawyer, a few years younger than W. J. McDonald,

and had attended to W. J. McDonald's business for a long time. He had persuaded his brother, H. D. McDonald, to return from Corpus Christi to Paris that he might help him with his business, and that they might live together. His devotion to his brother, H. D. McDonald, is described as being almost idolatrous. H. D. McDonald, without any cause shown in the record, and without any warning indicated in the testimony, on the 22d day of April, 1925, in his office, which was on the same floor and in the same building with the office of W. J. McDonald, shot himself to death with a pistol, and his body was found by W. J. McDonald, who telephoned for the undertaker to come and get the body. W. J. McDonald was found by the undertaker to be extremely nervous, griefstricken, and depressed. A few days after that he talked to H. D. McDonald's widow, the lady who prepared his meals for him as stated, and said: 'What are you going to do, Irene?' that was her name, her husband has just died, and she said: 'I'm going to live with my daughter,' and he said: 'Who is going to take care of me?' She said: 'I am going to have to take care of myself, and you will have to take care of yourself,' and after some further talk he asked her to stay in Paris. (This man was worth a million and a quarter dollars, if not more, but certainly that much). Mrs. McDonald told him she would stay in Paris and take a house, and they would live in the house if he would pay one-half of the expenses. He said no, he was not able to do that, and she went on and did not stay. This man had been in the money loaning business and banking business for 50 years, had made loans to people, and bought a good many land notes during that time, and, as far as the evidence goes, had always acted wisely, and never lost any money during that time. During the last 2 or 3 years of his life he slacked up on the loan business, made very few new loans. It seems he began to put his money very largely in bonds, which he would buy in large quantities and large amounts. He would renew notes, people owed him notes secured by liens on land, and he would extend them, give them more time, and he did make several new loans, the number being unknown now, that part of the evidence not being in yet, and he seemed to look after that part of his business about as well as he ever did before, so far as we can tell. He bought bonds frequently, and closed the transactions and seemed to handle them like he did before, even after the death of his brother, H. D. McDonald. He renewed a few loans, and perhaps made one new loan, which was recommended by a young man who was looking after his affairs for him, and in whom he appeared to have confidence, and who closed the transaction for him, submitting to him the lawyer's opinion and the papers, which the young man read to him.

"After the death of his brother, H. D. McDonald, he seems to have attended to his business transactions. He had a nephew, Dr. Will McDonald, and he got a pistol for the purpose of protecting himself against Will McDonald, whom he said was going to kill him for his property; there being no indication of any ground for any such thought or suspicion. A most excellent lady here, I wanted to do her full justice, Mrs. Charley McDonald, a lady whose honesty cannot be impeached, she would not steal anything—he said she was an unscrupulous and designing woman, and had stolen

some of his tablecloths and other things of a similar nature. He said about Mrs. Henry McDonald, the lady who had looked after his food, as indicated, that she was the meanest woman in the world, mean as hell—he said both these things. After he made the will—he made the will on the 8th of May, 1925—he went to Mayo Bros., he went up there about the 4th of August, and it was found that the cancer of the prostate had gotten worse, and had spread to what is called the semi vacular. That they possibly treated him with radium at that time, and sent him home, and he had a young man to go from here up there and bring him home. When he got here, he went at once to the sanitarium, where he remained until he died. He went to the sanitarium about August 24, 1925, the same year he made the will. At the sanitarium he had a special nurse, and, after she had been with him for about 3 months, perhaps 4—she slept on a cot in the same room where he slept—and one night, after the lights were out, she was on the cot, and he was lying on his bed, he called to her, and said: 'I don't think I'll need a nurse any more and I'm going to let you go, I'm not able to pay for a nurse.' He said he was not able to pay for a nurse. About 2 or 3 months after he went into the sanitarium, and during the first part of the time he was in the sanitarium, he continued to use the catheter on himself, and after a while, a couple of months, the man nurse at the sanitarium, the general nurse as distinguished from the special nurse, the man nurse states that Mr. McDonald had his own catheter, about half a dozen soft rubber catheters, and the said nurse said they ought to boil those things before they are used, and afterwards to keep them sterilized, and Mr. McDonald objected to that, and told him not to do it, because it tended to break the catheters, wear them out sooner than they would otherwise wear out, and requested the nurse simply to wash them in hot water, as Mr. McDonald had done.

"Along the latter part of his life, in talking with his secretary, he would forget the names of his half brothers and sisters. Going back a little, he would make a mistake in figuring with somebody he had a business transaction with, and would indicate to his secretary that he did not want the person to find it out, because they would find out his mind was failing. To illustrate: Mr. Long over here gave him a check—leave Mr. Long out of it—a gentleman gave him a check for so many thousand and so many hundred dollars and so many cents, for instance, $3,300.30, and the check was written for $3,-000.30, and when the mistake was found, he was unwilling to let the gentleman who gave the check find out he had not caught the error, and so expressed himself to his secretary. In talking with his friends about various and sundry matters of business, men he met in his office and their offices, except the occasional instances you have indicated which are typical of several others that happened, he appeared to be rational, would discuss his business matters rationally, and it is not known that he made any mistake in his business transactions. On the 8th of May, 1925, he executed this will. The typewritten document at his request and under his instructions had been prepared by his lawyer. He instructed his lawyer about the details of the bequests he wanted to make and what provisions he wanted to make in his will, and named as executors in his will a bank and

a friend of his in Paris, a bank in Clarksville. A few months after that, while in the sanitarium, he spoke of the will to the man named as executor and to the cashier of the bank at Clarksville, and told them its terms, and said he had named them as executors in the will. He said he had left to his nephew Charley McDonald, $15,000 for life in trust, and to Charley McDonald's three children, $15,000 each in trust; to his niece, Mrs. Brinton, $15,000, and to her two children, $15,000 each; to Mrs. Rodgers, his niece, $15,000, making a total of $120,000; to his nephew, Will McDonald, the one mentioned before in connection with the pistol episode, he left nothing, did not name him in the will. The children, descendants of his half brothers, were not named in the will. The balance of his estate, worth a million or more—approximately a million— he left to the regents of the University of Texas to erect and equip, or aid in erecting and equipping, an astronomical observatory for the promotion and study of the science of astronomy. Assuming all the statements you have indicated in your question to be true, in my opinion W. J. McDonald, on the 8th day of May, 1925, was of unsound mind. * * * Bearing in mind the hypothetical question, and answering the same question with an addition to it, assuming that in the fall of 1923 business seemed to worry W. J. McDonald, that he seemed to have a fear of meeting with a shrewd business man; that at least for a while he disliked to do his own figuring, and did not attempt to do it, and that he would not dictate a lot of letters to his stenographer, but would turn them over to her to answer, even his personal letters; that he would call for assistance in attending to his business; that he became very bitter against higher education, he said if he had fifteen boys he would give them a public school education, and learn them a trade, and then, if they wanted to specialize, they would be competent to earn their own way; he was very easily influenced outside of his business; he was in the Confederate Army, and he said about the time above mentioned that the Confederate War was brought about by six or eight young, hot-blooded Southerners who thought they could turn the world over, and that Jeff Davis was a confounded, egotistical, hot headed fool; he said the banking system was one of the biggest grafts he had ever seen; that he could take a young man here and a negro porter and run the biggest bank in town; he did not want his feeling towards Mrs. Charley McDonald and his feeling against her to be known by her; he would put things away where he could not find them, and said he hid things from himself; he expressed unfriendly sentiments towards the University of Texas—adding these things to the hypothetical question you asked me, my answer would be the same. Adding further, to the hypothetical question asked me, the fact that a few days after H. D. McDonald, his brother, had shot himself, W. J. McDonald went into a negro barber shop, a negro barber shop owned and operated by negroes for white men to shave in, and that he had repeatedly shaved in, off and on for 20 or 30 years, and after getting shaved, he beckoned to the owner of the shop, a negro man he had known about 30 years, and took him to the back end of the barber shop, and told him that astronomers would soon be able to see the gates of heaven, and see who were in there, and that that would be the next great wonder of the

world—adding these things to the hypothetical question, my answer would be the same, except that these things would strengthen my opinion, the answer would be that he was of unsound mind, and these additional facts would serve to strengthen the opinion."

There was in the evidence other testimony perhaps tending to show mental delusions, not embraced in the above hypothetical question, but those stated in the question are sufficient.

We base our conclusion, not only upon the facts recited in the hypothetical question, which, as we have said, the evidence tends to show, but upon the affirmative answer of the expert witness that the testator was, on the 8th day of May, 1925, of unsound mind.

We therefore recommend that the judgments of the trial court and of the Court of Civil Appeals be reversed, and the cause be remanded for another trial.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed, and cause remanded to the district court.

We approve the holding of the Commission of Appeals on the questions discussed in its opinion.