### KNOTT et al. v. JENSEN et al.
### No. 3392.

Court of Civil Appeals of Texas. Amarillo.
April 16, 1930.

Rehearing Denied May 7, 1930.

Carden, Starling, Carden & Hemphill, of Dallas, for appellants.

Hughes & Monroe, of Dallas, for appellees.

### RANDOLPH, J.

This is an appeal from a judgment of the district court of Dallas county, which denied the probate of the will of Mrs. Violet Rebecca Bowen, deceased, said will having been admitted to probate by an order of the county court, and from which order there had been an appeal to the district court. The will was tendered for probate by Mrs. Carrie Bowen Knott and her husband, John Knott; Mrs. Knott being a daughter of the testator. Mrs. Knott and her husband are the appellants herein, and will be referred to hereafter as the proponents. The contest was filed by Mrs. Violet Bowen Jensen and her husband—Mrs. Jensen being a daughter of a deceased son of the testator and a granddaughter of the testator—and will be hereinafter referred to as contestants.

The case was submitted to a jury upon one special issue, which is as follows: "Did or did not Mrs. Violet Rebecca Bowen have testamentary capacity on July 8, 1920, at the time she executed the will in controversy? Answer 'She did' or 'She did not' as you find," which the jury answered: "She did not."

In connection with this issue, the trial court, with reference to the term "testamentary capacity," and in explanation thereof, instructed the jury that "to make a valid will, the person making the will must have testamentary capacity at the time of the execution of the will. By testamentary capacity is meant that the person, at the time of the execution of the will, has sufficient mental ability to understand the business in which she is engaged, the effect of her act in making the will, and the general nature and extent of her property. She must also be able to know her next of kin and the natural objects of her bounty. She must have memory sufficient to collect in her mind the elements of the business to be transacted and to hold them long enough to perceive at least their obvious relation to each other and to be able to form a reasonable judgment as to them.

"You are further instructed that: If, at the time of the execution of the will by Mrs. Violet Rebecca Bowen, on July 8, 1920, she was under the influence of an insane delusion affecting the disposition of her property which she was making, then you are instructed that she did not at said time have testamentary capacity. An insane delusion is the belief of the existence of a state of supposed facts which no rational person would have believed."

The issue of undue influence presented in the contest was not followed up by evidence; hence it was abandoned.

The disposing portion of the will here in controversy is as follows:

"I desire and direct that all my just debts shall be paid out of my estate without delay by my executor hereinafter named and appointed.

"It is my will and desire and I so direct that after the payment of all my just debts, together with all the expenses incident to the probating of this will, I give, devise and bequeath to Violet Frances Bowen the sum of Ten Thousand Dollars ($10,000.00), and to Mertie J. Bowen the sum of One Thousand Dollars ($1000.00) and to Carrie Bowen Knott the sum of Four Thousand Dollars ($4000.00), the latter in trust, however, for Jack Francis Knott, Helena Knott, Karl Joseph Knott, and Marjorie Violet Knott, to be paid One Thousand Dollars ($1000.00) each, as and when they attain their majority, the said sum of Four Thousand Dollars ($4000.00) to be invested and re-invested by the Trustee in recognized securities and the enhancement from said fund to be evenly prorated so that the said Jack Francis Knott, Helena Knott, Karl Knott and Marjorie Violet Knott shall each receive an equitable and just proportion as of the time of each attaining such majority.

"It is my will and desire and I so direct that after the payment of all my just debts, together with all the expenses incident to the probating of this will, I give, devise and bequeath to my beloved daughter, Carrie Bowen Knott, all of my property of whatsoever kind or character, real, personal or mixed, in possession, reversion or remainder, by gift, devise or inheritance, together with the rest and residue of the estate of my husband and myself, as well as all of my separate property and estate and wheresoever situated, to have and to hold, manage, sell or dispose of as she may wish or see proper."

Under other terms of the will, proponents were named as executors without bond and without the control of a court, except as to the probating of the will, the recording of same, and the return of an inventory and appraisement of the estate.

Upon the verdict of the jury rendered in their answer to said special issue, the trial court entered judgment denying the probate of the will and holding that decedent did not have testamentary capacity to make it.

The decedent, Mrs. Violet Rebecca Bowen, was married to John W. Bowen in the city of Dallas in 1876, where she continued to reside until her death. They had two children born to them, the proponent, Mrs. Carrie Bowen Knott, and "J. D.," a son, who died in 1918, leaving surviving him the contestant, Mrs. Violet Bowen Jensen. In the year 1904, decedent and her husband were divorced, and the property she owned at the time of her death, by the terms of the divorce judgment, became her separate property. Testator was conceded to have been a hard-working, industrious woman, and in the years following her divorce she operated a rooming house. At the time of the execution of the will, the testator owned the real estate which was awarded to her in the divorce decree, and which at that time was worth $50,000, but, at the time of her death, the value of such real estate was variously appraised at from $25,000 to $35,000. There is no evidence that she owned any other property at the time of the execution of the will, except about $1,500 which she had on deposit in the Dallas Trust & Savings Bank.

The evidence upon the question of the testamentary capacity of the testator will be considered in our discussion of the question of the decedent's sanity and also the question of insane delusion, as bearing upon the want of testamentary capacity to execute the will.

We concur in the opinion of the honorable Chief Justice of the Fort Worth Court of Civil Appeals, in the case of Kell v. Ross, 175 S. W. 752, 757, in his holding that a mere mistake of fact of the kind indicated is not sufficient to raise the issue of insane delusion, where the only evidence tending to show that the testator was possessed of an insane delusion at the time of the execution of his will is the fact, as therein contended, that he was laboring under the delusion of having made certain advancements recited in the will, when the fact was otherwise.

■ The real question at issue here is want of testamentary capacity, and "whether such want of [testamentary] capacity is produced by ordinary and complete insanity, or by temporary aberrations or insane delusions." Rodgers v. Fleming (Tex. Com. App.) 3 S.W. (2d) 77, 80. Such being the rule, it naturally follows that, as a circumstance, the fact that the testator, when she made her will, had no such sum of money or personal property as would satisfy the money bequest, was admissible in evidence. Especially is this true when taken in connection with the disposition of the real estate belonging to her.

■ Upon the issue of mental incapacity or want of testamentary capacity, we quote the following evidence, which we think authorized the jury to find as they did, the evidence of the witnesses for proponents and contestants greatly conflicting in the matter of their opinions:

L. C. Neely, who lived near the testator during 1919 and all of 1920, testified as follows:

"I knew Mrs. Bowen but I did not know her other name, I lived right next door to her,

and I knew her during the time I lived there. I worked on the corner of Wood and Akard Streets for two years at an eating place, hamburger place and sandwiches, or a little restaurant and café. That was about 100 yards, or a little better, from where Mrs. Bowen lived. It was right across from the Cotton Exchange there. I know several of the people that lived at Mrs. Bowen's house during the year 1920. I know Mr. Jackson and I knew Mr. Kendricks that lived there, and my brother lived there a while. They were rooming there. Mrs. Bowen kept roomers, I think. Mr. Kendricks lived in the back. Sometimes I would see four or five people there, living in the house that she lived in and in the back, and sometimes there wouldn't be so many. During the time that I lived there next door and worked there at that place I had occasion to talk to Mrs. Bowen lots of times; I would see her every day. I have been in Mrs. Bowen's house and talked to her in her house, I guess, something like fifty times. Mrs. Bowen was at my place of business two or three times a week. The house where Mrs. Bowen lived, at 1306 Wood Street, is a cottage; and there was an outhouse in the back where old man Kendricks lived. I never noticed any outhouse, only where Mr. Kendricks lived. There was a big pile of lumber over next to the fence. Where Mrs. Bowen lived is an old house. Where Mrs. Bowen lived, in the house and on the porch and around there, it looked like a junk yard to me. How come me to be in Mrs. Bowen's dining room the first time, I went over there to figure on canvasing it and papering it for her, and I believe she said it was 12 x 20 feet; I didn't measure it myself, and I asked her if she wanted to furnish the material or wanted me to furnish it. I had a conversation with her. I was trying to make a deal with her to paper this house, and she wanted to give me the job all right but didn't want to give me enough for it. I was talking to her about papering the dining room and wanted to know whether she wanted to furnish the material or me furnish it, so I could give her a correct price on it, and she wanted to furnish the paper and me the canvas and me do the work, and I told her it would be $15.00 for me to furnish the canvas and her the paper and me do the work, and she says, 'I wouldn't give that much.' I says, 'Well, what will you give?' and she said, 'I will give you $4.00 if you will take it out in room rent.' At that time I had a room right next to the dining room. At that time she had in the house boxes with cans and buckets and old shoes and just different junk in them, and lots of papers. I never paid any attention to how many papers, but there was lots of papers, and she would have Mr. Kendricks to bundle them up and sell them. There was a bath tub in the kitchen. It was not connected up. She had a bath tub in there and tops of toilet stools lying over in the bath tub in the kitchen where she cooked. Mrs. Bowen dressed very common. She would have on a sweater and an old apron and an old cap. I think the cap might have been an old stocking pulled over her head; I never paid any attention to it; it might have been an old stocking leg or cap. I never saw her with a hat on. When she would be out away from the place I would see her walking up the street and she would go over and pick up pieces of lumber, or paper, or something of that kind, or a soda pop bottle, or something of that kind, and she usually had a sack with her, and she carried it over her arm or shoulder. I have seen her put papers and bottles in that sack.

"I have talked to her in my place of business. I saw her pick up some soda bottles and start home, and I went and told Mrs. Mayhew that she had them, and she said, 'let her go on with them, they don't amount to anything.' She got some soda water bottles out of the end of the stand there, and I went in and told Mrs. Mayhew, who was a partner of mine, and she said, 'Just let her go,' that she didn't know any better anyhow, and let her go on and take them. I later had a conversation with her about those bottles. She brought the bottles back to get a deposit on them, on the same bottles that same evening, and I told the old lady in there that was with me that they were our bottles, and she just give her 3 cents a piece for them. They were the same bottles that I saw her steal. I never saw her get all of the junk that she had accumulated in her house, but I would see her going in with some of it. She would go in with it under her arm or in a sack over her shoulder. I didn't examine it to see what it all was, but she would have it in a sack, and I have seen her go in there with a bundle of papers under her arm. We would get our meat up at the market across the railroad, up at Akard Street, at the Star Cash Grocery, and I have been walking along there behind Mrs. Bowen and she would just be talking to beat thunder, be talking to herself, I guess. That occurred half a dozen times or more, that I would be behind her that way. When I would be talking to her, we would talk about different things; she would be talking about family affairs, probably sometimes, and sometimes it would be some business property, or some business transaction, and sometimes she would have lots of money and sometimes wouldn't have anything, and 'she was going to starve to death,' 'didn't see how she was going to get by,' and in her talk she would jump from one thing to another; she would be talking about one thing and jump off on another conversation. I have talked with her about her son, J. D. Bowen. She had told me about him dying. She talked to me in reference to the division of her property. She said, 'Carrie was going to get half of it'

and her son's daughter get half. It was in 1920, in the middle of the year, that Mrs. Bowen said she was going to divide this property half-and-half. She came up there and was talking and ordered me to cook her a hamburger, and I got the hamburger about half done and she said she didn't want a hamburger, and I said, 'I have got it about done,' and she said, 'Well, I want a barbecue,' and I fixed her a barbecue, and I was telling the old lady the next morning about it, and the old lady said, 'Let her have anything she wants.' Now, it was that night, but I don't know what date it was, but it was along in the summertime, that we got to talking about the property and she brought it up herself. She was talking about her son's daughter (Violet, I believe she called her, I don't know—Violet or Carrie, but I didn't know Violet or Carrie or none of the rest of them), but she talked about her, and she talked about her fifteen or twenty times during the time I was there. I never did meet either one of them.

"I have seen some things that occurred out in the street in front of Mrs. Bowen's house; I have seen her put some old carpenters' sawhorses out there to keep people from parking in front of her place, and she had a police sign up there one time and somebody took it down and she raised the dickens about that, and asked me what she should do about it, and I said, 'Mrs. Bowen, that street belongs to the city, it doesn't belong to you.' She didn't want people parking out there and she raised the dickens and the police came along and picked up those horses and broke them, and she was going to report them to the City. Officers would come down there but I don't know who they were and never paid any attention to them.

"Along in 1919 my room was right next to her house and a little Spitz dog would get out there and she would go out there, raising Cain at it in the nighttime, along late in the night, but I never paid any attention to it. She would be hollering at the dog out there, and that is all I heard about it. I have talked to Mrs. Bowen in her house fifteen or twenty times, I guess.

"I never visited anybody in her house, but I did in the yard; I used to go back there to see Mr. Kendricks. I have seen Mrs. Bowen out late at night, after midnight, by herself. She would have a bunch of junk or sack or something—I didn't pay any attention to what it was. I worked at my place sometimes until two or three o'clock in the morning. The latest I have ever seen Mrs. Bowen out at night with a sack of junk would be along about midnight. I didn't examine the kind of junk that she was carrying around to see what it was. From my acquaintance with her during 1919 and 1920, and from my observation of her conduct and the way she

talked, and the way she acted, and the way she conducted herself, and the way she kept her house, and all the things that I have testified about, basing it on that, from my own personal knowledge, I would say, in my opinion, that in the year 1920 Mrs. Bowen was of unsound mind; I considered her of unsound mind; that is the way I figured her all the time.

"I considered her 'buggy' all the time, but she would be just like any other crazy person. I think she was crazy all the time. I call it crazy.

"When I went over to figure with her about papering her house I figured she was crazy. I knew she was crazy. The figure she offered me was crazy. When I first went to figure with her I did not know she was crazy. I had not been living there so long at that time."

Mrs. Pearl Hall testified:

"I live at 4234 Roseland Avenue. I have been married but am a widow now. My husband is dead. I am employed at the Adolphus Hotel. In the year 1919 and in the year 1920, I lived at 1306 Wood Street with Mrs. Bowen at her house. That was Mrs. Violet Rebecca Bowen. I lived there from September 1919 to August 1920. I was living there in the month of July 1920. I lived there with my husband. My husband was employed at that time. I was not employed at that time, and stayed there at Mrs. Bowen's house all the time during the daytime, and during the night when my husband would come from work I would be there with him. During the time I lived there I saw Mrs. Bowen every day, and conversed with her several times during each day and in the evening, during the entire time I was there.

"The house where Mrs. Bowen lived was a one-storey house with some rooms in the back, and we lived in the back. There were two houses back there and we lived in what you might call a garage-house. Where I lived was about as far as from here to the back of the court room there, from Mrs. Bowen's back door. I paid rent to Mrs. Bowen. I had occasion to go into the room where Mrs. Bowen lived during the time I lived there; I have been in her room more than once. Mrs. Bowen had two rooms. I had occasion to go into the room where Mrs. Bowen lived during the time I lived there; I have been in her room more than once. Mrs. Bowen had two rooms. I had occasion to go into her room during July, 1920, and also in the month preceding that and the month following that. During the summer of 1920, Mrs. Bowen's room was piled up to the ceiling with every imaginable kind of junk; all kinds of old dishes and all kinds of old chairs, and chewing gum wrappers, and everything she could pick up anywhere was in her room on the table, and she had an old time lounge, and it was covered about an inch with dust and had all

those bundles and papers and dishes and all kinds of rags that she had picked up at different places that other people had left, and she had them piled up on the table and on the buffet, and there was just a small passage-way where you walked, a little place where she sat and where she read when she did read. In the kitchen she had a fruit basket full of coffee cans and different kinds of cans that she had picked up that we had thrown in the trash can; she said she might have a use for them; she said every seven years you always find a use for everything, so she picked up everthing and said she would keep it and sometimes she might have a use for it. She had tubs and fruit baskets full of those things, sitting in her kitchen. You could hardly move around. On the back porch she had papers; she picked up papers everywhere, and she sold them to the junk man, I believe she said; I don't know whether she did nor not because they were always piled up there as far as she could reach; she would stack them up; old Ford cushions and boxes and trunks and carpets, and old worn-out things that she would never have use for, were piled up on this porch, all the way around, and under the porch she had it piled up with all kinds of splinters and pieces of wood, and old ladders, or anything that she could pick up that she couldn't keep in the house—she kept it under the house. She had a little back garden, out back of one of the rooms, and she had old shingles that she had picked up where they had covered houses, and she put them in this place back there, and wire and different things. During the year 1920 I knew she had plenty of money to buy clothes with and she wore ragged clothes; she wore a red sweater most of the time that was patched, and one or two aprons with patches on them, and her sleeves would be just covered almost with patches, when I knew she was plenty able to buy more. I had a conversation with Mrs. Bowen about the way she dressed, and I asked her many times why she wore the clothes she did—those patched clothes and ragged clothes, and so many different aprons and sweaters that were worn out—and she would say, 'Well, I am not able to buy any more; I have got to save,' when I knew she had plenty. And people would think there was something wrong because she would go like she did, because she had those ragged clothes on, and those two or three different kinds of clothes—two or three different aprons. When she went out around in the neighborhood, or shopping, she did not wear a hat like a ladies' hat but she wore most of the time a kind of skull cap, lots of times a stocking, and sometimes one of those advertising caps like flour, and she would wear something like a skull cap on her head. She ate hamburgers most of the time, and the very cheapest of meats; she didn't eat enough to keep her alive, it didn't seem to me like, and I asked her so many times why

she didn't eat more and why she bought those hamburgers, two for fifteen cents, and she would say, 'Oh, I am not able to; I have to save,' and she would buy a pint of milk and it would do her two or three days, just drink a little bit, and she didn't eat enough, really, to keep anybody alive. I gave her something to eat every day. I had light housekeeping rooms and I fixed lunches every day, and after I got through eating she would ask me if I had anything left, that she wanted it, and I would give her what I had left, because she didn't have anything in her ice-box left. I knew she could get it but I felt sorry for her and I would give her what I had left every day. She has gotten things to eat out of my ice-box. If I happened to have anything left after lunch and went away in the afternoon, when I came back it was gone, and so I could tell she had been in my room; there would be papers and things that she would pick up out of my room and carry and put in her things, and she always went in and got whatever I had left, and lots of times I have said something about it, and she would say, 'Well, I got hungry and I went out and got it.' She would own up to it after I asked her about it; if I had anything that I didn't want eat up, I usually hid it to keep her from getting it. When I would empty the trash out of my house into the trash barrel, she would go to the barrel and pick out cream jars and papers, or cans, or anything; chewing gum wrappers and tin foil; she would pick up tin foil and carry that in her room, and junk it up with the rest of this junk she had. In going about the street she usually carried a sack or some of these shopping bags, or some kind of paper sack, and she would pick tin foil and chewing gum wrappers and pieces of paper and put in this bag and carry it home. I don't remember ever seeing her carry a sack over her back. I would see her mostly coming in the yard now. I have heard her speak of her son. She was very fond of her son. I had a conversation with her in my husband's presence, with reference to the clothes that her son had in his lifetime. He had some suits, and I remember some patent leather shoes he had, and she wanted to sell them to my husband and he wouldn't buy them, and she thought because they were J. D.'s that anyone would want to buy them, and she got awfully peeved because my husband wouldn't buy them, because he wouldn't buy her son's clothes. She tried to sell my husband the shoes, and she thought because they were her son's that anybody should be glad to wear them. They were patent leather. When Mrs. Bowen and I would be talking she would be flighty; she didn't seem to be able to concentrate on anything; she would be talking about anything and just in a moment she would change to an entirely different subject; she didn't seem to be able to concentrate on the same thing that she was talking about; she was flighty and she would

talk about one thing and then turn and talk about something else that she had not even thought about talking about. Almost every night that she was at home she would wake up, I don't know whether she would dream, she said she was dreaming, and she would wake up and holler and wake everybody up, and she had a little dog that stayed on the back porch, and if he made the least noise she would wake up and scream. My husband always complained about being woke up so much. She would scream out at three o'clock in the morning, or any time, just wake up and scream out about something, didn't make any difference what it was. I have seen Mrs. Bowen when she was drinking liquor, and when she was drinking she was very talkative and laughing and hollering and screaming out at something.

"Along in 1920 she used to get out and curse the people that would park their cars in front of her house, because she thought Mrs. Knott was coming over and she wanted to save the parking place. And she would put tacks out in the street. I have seen her put tacks out in the street, and I have had conversations with her about that. Early in the morning usually she would throw them out, and I said, 'Mrs. Bowen, why do you throw those tacks out? Don't you know it will ruin the tires?' and she said, 'They shouldn't park in front of my house,' and she would throw glass out there and I would go. in the house because I was ashamed of the way she would curse people out that would park.

"I have seen her write notes and put them in automobiles there in front of her house, but I never read any of the notes. I have had conversations with Mrs. Bowen with reference to selling her real estate. She told me that she wanted to sell but Mrs. Knott would not agree to the price that she had been offered for the property. She told me that she wanted to sell her property on Wood Street and Mrs. Knott would not agree to the price that she was offered, and she wanted to sell it, and she was worried about it quite a lot, because she really wanted to get rid of it, she said, and sell it, but Mrs. Knott would not agree to the price. She talked about Violet quite a lot and she told me a number of times she intended to provide well for Violet because she was her namesake, and she was quite fond of her and she intended to give her her part of it; she told me that a number of times. I don't remember whether she told me what part she was to get, or not. She said Violet was her namesake; that is this young lady here. She was very fond of her son, this girl's father, and spoke of him every day; she worried about him being gone because she was very fond of him. Basing my opinion upon the manner in which Mrs. Bowen lived, her personal appearance, her conversations, her actions and my contact with her, from my observation of all these things, in my opinion, she was of unsound mind in July, 1920."

Other witnesses testified to substantially the same condition of decedent's mind, and the divorced husband, John W. Bowen. testified:

"My name is John W. Bowen. I live down at the Poor Farm. I am 79 years old, will be 80 years old the 6th of September. I knew Mrs. Violet Bowen in her lifetime; she was my wife. I was married to her in 1876. I was later divorced from her. I think we were divorced about 1904, if I am not mistaken. I lived with her as her husband somewhere about thirty years. Mrs. Bowen and I had two children, one boy and one girl. The girl's name was Carrie, who is now Mrs. Carrie Knott. She married Mr. John Knott. We also had a boy, named J. D. Bowen; he is now dead. J. D. Bowen had a child, just one child, a girl named Violet Bowen, named after my wife. I can not see well enough to recognize the girl sitting there in the court room, but J. D. Bowen's girl was named Violet Bowen. After my wife and I were divorced, I visited her occasionally.

"I cannot remember the date that my son, J. D., died but I think it was 1918 somewhere. After my son died I went up to see my former wife, Mrs. Bowen, occasionally. We were friendly, and we remained friends until she died in 1926. After my son died I would go up to see Mrs. Bowen sometimes once a week and sometimes twice a week and talk with her. We talked about old times and about anything that would come up. After the death of our boy J. D., I noticed a change in the mental condition of my former wife. During the time that Mrs. Bowen and I lived together and up to the time that my son died Mrs. Bowen had always been a good housekeeper, and she was always neat and clean while we lived together. My wife discussed with me her affection for her boy. After the death of my boy in 1918, I visited my former wife there at her home, in her room where she lived. As to the condition of the room that she lived in after her son died, I could not say as to that—anything different from what it usually was. I met her when I was there: She was in the dining room, sitting by the fire—sometimes sitting by herself. The room was not clean when I would visit her at that time. There was a barrel in there that had a lot of bottles in it, in that room, and she had a stack of old newspapers out all over the porch, and I think there were some in the room. There was junk in the room and a lot of junk on the porch.

"Before my son died I never did find anything of that kind in there, and never found anything in that condition. Before my son died there was no junk in the room; after my son died Mrs. Bowen was different from

what she had been. In 1919 and 1920 my former wife's conversations were not like they used to be at all; she would talk about one thing a little bit and then get off and talk about something else. She did not concentrate and talk like she had before her son's death. In these conversations sometimes she talked about her son. In fact, she talked a good deal about him right after his death when I would see her.

"The property on Wood Street was acquired by us after we were married. We were married and then bought it and built on it, and later I conveyed my interest in it to my wife, and I had no interest in the property at the time of her death. After J. D.'s death, Mrs. Bowen talked to me about J. D.'s girl, and about Carrie, and said that the property was going to be divided between them after her death; said it was going to be divided between J. D.'s daughter and Carrie. That came up about that junk business; she said she was going to make all she could to live on and save all she could to go to Carrie and J. D.'s child. She did not say how it was going to be divided, but said J. D.'s child and Carrie would get her property. She said that after J. D. had died, that the child would get his part.

"Basing my opinion upon living with Mrs. Bowen for thirty years as her husband and knowing her twenty years after that by visits and observing her and talking to her after the death of J. D., and seeing the environment in which she lived, and the way she conducted herself, in my opinion—after the death of J. D. and along in 1920, Mrs. Bowen was of unsound mind."

We do not attempt to give all the testimony of the witnesses quoted from.

W. H. Flippen, an attorney at law of Dallas, Tex., testified in behalf of proponents, in part, as follows:

"She told me that her estate consisted principally of real estate. Of course, I didn't have any idea of how much money she had in banks. I don't know whether I asked her the specific question of how much money she had or if she had any money anywhere, but I was under the impression that she had monies in the National Bank of Commerce with J. B. Adoue. She did not tell me how much money she had in the bank with J. B. Adoue, or, if she did, I don't remember it. If she told me the amount I would not recall it. I do not recall how much cash bequests she gave to people, without seeing the will. The will says $10,000 and $4,000 and $1,000, which would be $15,000. If the will reflected that amount I knew it, but I wouldn't testify to my independent memory now about the details of that will. If I put in the will that she have $15,-000 in cash, to my best recollection, she told me that she had that much cash, or I would not have written it that way. My impression is that the money she had was in the J. B. Adoue Bank and the will reflects exactly what she told me as to what existed and I put it in there. If she had not told me that she had that money I would not have put it in there. Mrs. Bowen did not say anything to me about having any of these legacies payable out of the real estate. She must have represented to me that she did have the money or I would not have written it in the will that way; she must have represented to me the amount of each of her bequests and I set them down in accordance with her express desire."

In the case of Rodgers v. Fleming, supra, the Commission of Appeals, in considering the evidence of want of testamentary capacity, as shown in that case, says:

"We have considered the testimony very carefully, in keeping with the importance of the question and the magnitude of the case, and have concluded that the evidence does raise the issue, and that the trial court and the Court of Civil Appeals erred in holding to the contrary. No useful purpose would be subserved by our discussing the testimony in detail, but a reproduction of the hypothetical question propounded by contestants to Dr. Guy F. Witt, a practicing physician, and a specialist in nervous and mental diseases, together with his answer, will show conclusively, we think, that the issue of want of mental capacity through insane delusions was raised by the testimony. The hypothetical question finds support in the statement of the evidence, and is as follows. * * *"

That court then sets out a lengthy hypothetical question which had been propounded to an expert witness, Dr. Witt, as covering the facts in evidence, and then holds:

"There was in the evidence other testimony perhaps tending to show mental delusions, not embraced in the above hypothetical question, but those stated in the question are sufficient.

"We base our conclusion, not only upon the facts recited in the hypothetical question, which, as we have said, the evidence tends to show, but upon the affirmative answer of the expert witness that the testator was, on the 8th day of May 1925, of unsound mind.

"We therefore recommend that the judgments of the trial court and of the Court of Civil Appeals be reversed, and the cause be remanded for another trial."

This opinion of the Commission of Appeals was expressly approved by the Supreme Court.

We are of the opinion that the evidence introduced on the trial of this cause supports the finding of the jury that the testator did not have testamentary capacity on July 8, 1920, at the time she executed the will in controversy, and that the court did not err in submitting the question of insane delusion to the jury.

These issues and findings thereon, in our opinion, control the disposition of the case, and render all other questions raised in appellants' brief immaterial. We therefore affirm the judgment of the trial court.