## STONE et al. v. GRAINGER.

### No. 9567.

Court of Civil Appeals of Texas. Galveston.

Nov. 25, 1933.

Sewell, Taylor, Morris & Garwood, of Houston, W. C. Campbell, of Palestine, Wm. Emerson Stone, of Jacksonville, and Lee G. Carter, of Dallas, for appellants.

J. D. Pickett, of Palestine, for appellee.

PLEASANTS, Chief Justice.

This appeal is from a judgment of the court below refusing probate of an instrument offered for probate as the last will and testament of Mrs. Etta V. Grainger, deceased. The application for probate was presented by appellants, William Emerson Stone and John L. Carson, as executors of the will.

Appellee Charles J. Grainger, the surviving husband of the deceased, Mrs. Etta V. Grainger, contested the probate of the offered will on the ground of lack of testamentary capacity in its maker, Mrs. Grainger, at the time the instrument was executed.

The probate of the instrument was refused by the county court on November 26, 1928, and, on appeal and trial de novo with a jury in the court below, a like verdict and judgment was rendered on May 19, 1930, from which judgment this appeal is prosecuted.

After the cause reached the court below, the contestant by an amended answer further assailed the instrument offered for probate as the will of Mrs. Grainger, on the ground that its execution was obtained by fraud, undue influence, and misrepresentation on the part of one of the beneficiaries named in the will. No evidence sufficient to raise these issues was adduced or offered by contestant, and they were not submitted to the jury. There being no cross-assignment complaining of the failure of the trial court to submit these issues to the jury, they are not in the case on this appeal, and will not be further mentioned.

The instrument offered for probate was wholly written by Mrs. Grainger, and disposes of her estate as follows:

"Last Will & Testament of Etta V. Grainger.

"Know all men by these presents that I, Etta V. Grainger, being of sound mind and realizing the uncertainty of life—& desiring to make disposal of my earthly possessions before passing on to the great beyond—I do here now—& in my own handwriting—declare this to be my last will & testament.

"1st. I desire that all my just debts & funeral expenses be paid & that a marble coping be placed around my cemetery lot (after lot is filled in)—a granite marker placed at my grave—similar to that at my mother's grave—& a granite monument (family stone) be erected—the total cost to be the sum of one thousand ($1,000) dollars. I desire also that the sum of one thousand ($1,-000) dollars be invested & kept invested in U. S. Government securities & that the interest on which shall be used for the upkeep of my cemetery lot.

"2nd. I desire that my farm in Bell Co. Texas—near Salado—be sold & that one half of the proceeds from the sale of the six-hundred & forty acres be given to my husband Charles J. Grainger & that out of the proceeds remaining—be given to friends who have contributed in various ways to my comfort & well-being in my later years—the following amounts: To Mary Elizabeth Carter Stone and Mary Kate Hunter—one thousand ($1,000) dollars each—to John L. Carson & wife Maude Hunter Carson the sum of five hundred ($500) dollars each. To Paul J. Pennybacker & to my second cousin Victor Kohler—(being grandson of Mrs. H. Menninger of Manitou Colo.) the sum of five hundred ($500.00) dollars each—also to my God child by baptism—born Grace Hutchison—& to St. Philips Episcopal Church of Palestine, Texas—the sum of five hundred ($500.00) dollars each—and I desire that the balance of the proceeds from the sale of the farm be given to the organization known as the Volunteers of America & under the leadership of General & Mrs. Ballington Booth—as I believe that this organization contributes more good to humanity—both spiritual & temporal than any other organization that I know of—& that is what I desire to accomplish with the goods which I possess.

"3rd. I desire that my husband Charles J. Grainger have my homestead in Palestine, Texas, for his use during his lifetime & that after his death—it be sold & the proceeds be invested in U. S. Government securities & the income from which to be used by the society of Organized Charities in the City of Palestine, Texas.

"4th. I desire that Mary Elizabeth Carter Stone have one half (twenty thousand acres) of my forty thousand acres of land in the Catalina Grant in Lower California—Mexico (& fully described in my deeds), and that the Volunteers of America have the other twenty thousand acres—and that these two beneficiaries attend to the dividing & settling of this part of my estate themselves—it being under a foreign government—& it is not my desire that the settling up of the rest of my estate be in anyway delayed by this particular part—it being entirely separate & distinct from it.

"5th. I desire that all my Bonds—Stocks—securities—cash in Banks and elsewhere & not otherwise disposed of in this instrument be added to the above mentioned Volunteers of America.

"6th. I desire that Mary Kate Hunter be given my books—& that Mary Elizabeth Carter Stone be given my clothing—jewelry—china—glass ware, pictures, musical instruments—parlor furniture & household ornaments.

"7th. I further desire that if any person, mentioned as my beneficiary—make any effort to break or annul this my last will & testament—that that person shall forfeit the bequests herein set down for him or her & that portion be added to the portion of my estate as set down for the Volunteers of America.

"8th. I desire that Judge W. H. Gill of Houston, Texas, and W. E. Stone of Jacksonville, Texas,—serve as Executors of this Will & that they be paid a reasonable & just remuneration for their services—and in the event either one of the above mentioned gentlemen be unable to serve in this capacity—I desire that the proper Court official of Anderson Co. Texas—appoint a suitable one in his place.

"Signed: Etta V. Grainger.
"Witness: M. A. White, Long Beach, Calif. Apr. 14, 1924.
"Witness: Karle B. Morgan, Long Beach, Calif. Apr. 14, 1924."

(Judge Gill died prior to the death of Mrs. Grainger, and appellant John L. Carson was duly appointed substitute executor by the judge of the district court of Anderson county, in accordance with the directions contained in the will.)

The evidence shows that Mrs. Grainger and appellee, Charles J. Grainger, were married in 1881, and lived together as husband and wife until 1923, when she went to California and lived there until her death in August, 1927. They had no children. They were married in Houston, Tex., lived there for some time and then moved to Kansas City, where they lived for several years, and then returned to Texas and made their home in the city of Palestine, where they continued to live together until Mrs. Grainger went to California. They were both poor at the time of their marriage. Mrs. Grainger was an educated, refined woman, fond of society, and took much interest in women's clubs, and especially in those interested in music. Mr.

Grainger was a cripple, but a very industrious man who always obtained employment, lived economically, and turned all of his savings over to his wife. He showed his wife every consideration, provided her with a comfortable home, and furnished her with servants to relieve her of all of the hard work of housekeeping. Up to the time of the breakdown of Mrs. Grainger's health, which was some years before she left Palestine to make her home in California, they lived happily together, and their home was one of the social centers of Palestine, and was often visited by their many friends, a number of whom testified on the trial of this case. All of them testified to appellee's respectful attentions to his wife.

Her health began to fail when she was about forty-five years old. She often suffered from nervous spells, during which her husband and others who might be with her were asked to hold her hands, which she said gave her relief. She several times complained to her servants that "little black devils were sitting on her shoulders." She also claimed to suffer rheumatic pains in her limbs, began to grow fat, and spent most of her time sitting in her chair, and used two sticks when she moved around. She gave up all of her church and club work, and during the five years next preceding her going to California lived a secluded life, spending most of her time at home and receiving few callers. During this time she became distrustful and fearful of her husband. She slept with a pistol under her pillow, accused her husband of being in love with a Mexican woman, and wanting to be rid of his wife so that he might marry the Mexican, and charged him with attempting to get possession of her money and property.

Appellants adduced no testimony tending to justify Mrs. Grainger's charges against appellee.

When she left to go to California, she told one of the witnesses that she was going away because she was afraid to live with appellee, and also that he neglected her and would do nothing for her. About a year before she went to California she told Mrs. Cunningham, who testified in the case, that appellee had turned all their money over to her and had the property put in her name, and that neither of them would make a will, and that, unless this was done, Mr. Grainger's sisters would get part of the property if he died before she did, and that she wanted it all.

After Mrs. Grainger reached California, she procured a wheel chair, and used that in going about attending to her business. She had an alert good business mind, was above the average in intelligence, and gave her accounts and investments good business attention, but her distrust and fear of appellee remained and increased. This fact is shown by her statements in numerous letters written to her old Texas friends and associates, not long after the execution of the offered will. Some of the expressions in these letters may be hereinafter set out, also evidence as to her erroneous claims that all of the property and money disposed of by the will belonged to her.

The witnesses to the will each testified, in substance, that Mrs. Grainger was, in his opinion, of sound mind and had a full and clear understanding of the extent and character of the estate disposed of by the will, and fully appreciated her relations to the beneficiaries and the objects of her bounty as expressed in the will.

Mr. White, who was the cashier of the California National Bank of Long Beach, testified that to the best of his recollection he opened the account with Mrs. Grainger in May, 1923, at the bank. Practically all of her conversations with him were relative to business matters in connection with deposits, her safety deposit box, and possible investments in United States securities and a discussion as to the various issues of such securities.

Witness, in this connection, testified to Mrs. Grainger's extraordinary intellect in the following positive and forceful manner: "In my opinion, Mrs. Grainger was always of sound mind, and had a very clear grasp of business matters, and was above average intelligence, and was particularly keen, for a woman, in the understanding of business matters and investments. In my opinion, she was of sound mind on the 14th day of April, 1924. Mrs. Grainger was above the average intelligence, and, as I before stated, was particularly keen in the matter of proposed investments and in the handling of her funds and account, and she was cautious in making investments. She was possessed of a strong and bright mind and keen intellect. She appeared to be well versed in investments, and was able to talk intelligently about the various issues of Liberty Loan Bonds, of which she appeared to have some, and she appeared to be cautious and careful in handling her financial affairs. Mrs. Grainger at all times appeared to be mentally sound and of keen intellect."

Mr. Morgan, the other witness to the will, who was assistant cashier for the California National Bank, after stating that he had known Mrs. Grainger as a patron of the bank several months, and that he and Mr. White signed as witnesses at Mrs. Grainger's request in her presence and the presence of each other, further testified: "I always considered Mrs. Grainger a very keen business woman. She occasionally requested information and advice, but in all of her transactions with me it was my opinion that she had a very keen mind and quick to see what was the best to do. In my opinion, she was of sound mind and memory. She never did say or do any-

thing in my presence that would suggest her mind was unsound. She was above the average in perception of business transactions, particular with reference to securities. I considered she had a strong bright mind and above that of the average woman in perception and understanding of the value of securities. She was of sound mind and good mentality in my opinion. She stated to me, in the presence of Mr. White, that she had written the will herself. The will was never revoked by Mrs. Grainger, not to my knowledge."

Several other California witnesses gave testimony as to Mrs. Grainger's mental capacity which in the main tended to corroborate the testimony of the witnesses to the will upon this question. A number of letters written by Mrs. Grainger to her Texas friends evidence that her general intelligence and business capacity was above the average, but, whenever in these letters she mentioned her husband and their property, she expressed her fear and distrust of him, and claimed to own all the property except one house and lot which was purchased by and deeded to appellee. This house and lot was worth about $2,500. The value of the homestead and of the Bell county farm was largely in excess of this amount. The Bell county land was inherited by Mr. Grainger and his sisters from their parents. He inherited a one-seventh interest, the remaining interests in the property were purchased from the other heirs or their vendees. The deed to a three-sevenths interest so acquired was made to Mrs. Grainger in her separate right. Another one-seventh interest was deeded to her, but the deed did not recite that she had acquired the property in her separate right. The remaining two-sevenths interest was also conveyed to her by deed which contains no recitals showing the conveyance was to her separate estate. The lot upon which the homestead was established was conveyed to Mrs. Grainger as her separate property. Mr. Grainger borrowed the money from a Palestine Loan Company to make the improvements on the lot. This money was repaid by installments covering a period of ten years. This is all of the real estate acquired by Mrs. Grainger and appellee.

Mr. Grainger was continuously employed for twenty years by the I. & G. N. Railway Company in different capacities after he and Mrs. Grainger moved to Palestine from Kansas City. After he left the service of the railway company, he was engaged in other business employment up to a few years before the trial. After the purchase of the Bell county farm, he managed its business. As before stated, he was industrious and economical, and he and Mrs. Grainger saved a substantial portion of their yearly income. The amount of cash, bonds, securities, diamonds, and other personal property held by Mrs.

Grainger at the time of her death was worth from fifteen to twenty thousand dollars. The evidence fully justifies the conclusion that all this property, except the one-seventh interest in the Bell county farm inherited by Mr. Grainger, and possibly a few heirlooms received by Mrs. Grainger from her mother, was accumulated from the earnings of the community, and that Mrs. Grainger only began to assert claim to the ownership of all this property about five years before she went to California, and after her mind became obsessed with an unfounded fear and distrust of her husband.

Dr. W. J. Johnson, a graduate of the Fort Worth College of Medicine, which is now a part of Baylor University, testified that he had been a physician for twenty-six years, and is now Superintendent of the San Antonio State Hospital for insane patients. He has served for two years at Austin, four at Terrell, and four and one-half years at Rusk in similar State institutions, and had observed and studied the cases of some four thousand patients in these institutions. "From my knowledge and experience gained in the treatment of insane persons, I feel able to give a professional opinion as to the soundness or unsoundness of the mind of an individual if a statement of facts bearing upon their condition and giving a history of the case were made to me. If a fair statement of the material facts over a period of years, disclosed in the history of an individual is made to me, I feel able to determine whether or not that patient's mind was sound or unsound, without the necessity of seeing them and giving them a physical examination. I have given some study to what purports to be the facts in this contest of the will of Mrs. Etta V. Grainger, deceased. I first began my study of this case approximately a month ago. A statement of the salient features that the evidence disclosed in this case was made to me as a basis for my study of the case. I came to this trial at Palestine on Monday night. I have been here continuously since that time. The hypothetical question was shown to me before I took the witness stand. I saw that hypothetical question yesterday afternoon. I have given some thought and study to that hypothetical question."

He was then presented with a long hypothetical question which, while it contains some immaterial statements of the facts in evidence, contains a sufficient statement of the material facts. In answer to the question of what, upon the hypothetical facts stated, was his opinion as to the soundness of Mrs. Grainger's mind on the day the will in question was executed, he replied, "Unsound."

He further testified:

"I have an opinion as to the nature or type of her mental unsoundness. It was a paranoic condition of the mind. It is a functional disease that affects the functions of the

mind, and not an organic change in the brain. This usually begins after middle life. Usually at the beginning of this disease, the persons imagine their bodily health is failing them; there is a change in the personality of the individual; they tend to become introspective. More than other things they frequently change in their manner of living; they frequently become what we term peculiar or eccentric, distrustful of other people. They want most of the time to be alone because they are thinking of themselves, their condition, they realize there is something wrong with themselves, they are not adjusting themselves to society as well as they formerly did; that things are not going right for them. They attempt to reason this out, find out why they are that way, and they reason on false principles. They start wrong, and to them they reason logically, and they attribute their distress, their condition, to their environment, or the circumstances under which they are living, and to friends or relatives or individuals, because they can't see that the trouble is within themselves. They must account for it, so they attribute their trouble to other people. Then, in forming delusions of persecutions, they tend to become more egotistical, and they justify their own acts in every way because of their faulty reason. They go on, and if they live long enough, they develop what we call insane delusions. They may have ideas of wealth they did not have. In this condition, the memory is usually unimpaired and, aside from their delusions, they can discuss things reasonably and logically. They are capable of reasoning well, except when the things they are reasoning on are governed by their delusions. During this time their delusions of persecution continue, regardless of whether they move themselves away. In attempting to get away from what they term is the cause of their trouble, they frequently become rovers, moving away to remove themselves from the cause of their trouble. However, the delusions always continue with them. This is a progressive trouble and it is impossible for a person to recover from this condition, because it is a diseased condition of the mind, and there is no treatment or anything that will benefit them.

"A delusion is a false belief not founded on facts and which you cannot remove by any evidence. If you give a paranoiac a correct basis or premise on which to reason, they may reach a correct conclusion. The marked characteristic in the reasoning of a paranoiac is a delusion of persecution. The memory usually is not faulty in the case of a paranoiac such as I have described. A paranoic condition of the mind is not inconsistent with keenness and brightness of the mind. I mean by that, a person with a paranoic condition reasons, but their reasoning is influenced by their delusions. If they are reasoning on something that has no connection with their delusions, of course that would not affect their reasoning. A person may have delusions of persecution in regard to a particular person, and may be well educated and continue to work problems in arithmetic, geometry and trigonometry; because their reasoning is not governed or influenced by this particular influence. But on a subject upon which they have their delusions, of course, their reasoning would always be defective and irrational. * * *

"The fact that she was able to remember and hold in her mind the names of the beneficiaries in this will, assuming them to have been former acquaintances and friends of hers, would not be inconsistent with a state of mental unsoundness; because, as I have explained before, their reasoning, their judgment, and their will power are only affected by the delusions they have. In anything not touching their delusions, their judgment may be reasonably sound, may be sound; and their memory is usually unimpaired in these conditions.

"My answers to the two hypothetical questions were based upon my examination of all the facts presented in the question. In some instances a physical examination is necessary to determine the mental condition of a person, even if the material facts of the patient's symptoms are stated. It may be necessary, in some instances, it depends upon the type of disease that we are attempting to find out. It would be necessary in a suspicious syphilitic condition, or suspicious tubercular condition or anemic condition, that produce symptoms of insanity that are referable to those diseases. Then, we like to make physical examinations too, but an opinion can be given upon the mental condition without the physical examination. There are no physical peculiarities that accompany the mental unsoundness of a paranoiac."

The only question submitted to the jury by the trial court was: "Do you find from a preponderance of the evidence that Mrs. Etta V. Grainger had testamentary capacity on April 14, 1924, at the time she executed the will in controversy?" The jury's answer to this question was "No," and upon the return of this verdict judgment was rendered in favor of the contestant, denying probate of the will.

Appellants' brief presents thirty-four propositions, each of which is urged as a ground for a reversal of the judgment. We have duly considered all of these propositions, and none of them, in our opinion, presents any sufficient ground for a reversal. All of them are overruled. We shall only set out and discuss in detail in this opinion the propositions which we think material in determining the disposition of the appeal.

█ The first six propositions complain of the refusal of the trial court to instruct a verdict in appellants' favor. Each of these

propositions is based upon the theory that, because no testimony as to the mental capacity of Mrs. Grainger was offered by contestant, of any witness who knew and observed the testatrix at or about the time of the execution of the will, or at any time during the five years she resided in California where the will was executed and where the testatrix thereafter remained until she died, the testimony of the witnesses to the will, and two other witnesses in California who were her friends and associates, to the effect that she was of sound mind when she executed the will, being uncontradicted by any competent evidence, required the court to instruct the jury to return a verdict in favor of the appellants. Appellants' contentions under these propositions are set out in detail in their second proposition, as follows:

"Contestant, in his efforts to contest the probate of the will in question, not having offered the testimony of any witness with knowledge of the mental condition of testatrix at or about the time the will was executed, or at any time while she was in California, to contradict the testimony of Proponents' witnesses who knew, observed and dealt with testatrix at the time of, before and after the execution of the will and who testified positively and disinterestedly as to her keenness of mind, or to contradict the evidentiary force of the letters written by testatrix in California at about the time the will was executed and the letters written before and after that time, Contestant relying on the weaker and less satisfactory testimony of witnesses who had not seen testatrix since before she went to California about a year before the will was executed and who did not see her again before her death more than five years after she went away as to what they considered peculiarities on the part of testatrix evident so long before she went to California that they could have no probative force whatever regardless of their character or degree (those relied on by Contestant being evident many years before testatrix went away and the subsequent execution of the will) and which peculiarities were not of a character or degree to amount to or show testamentary incapacity even following their manifestation, it follows, as a matter of law, that Contestant's evidence was incompetent on account of remoteness, and also on account of the character of the matters sought to be proved, to show testamentary incapacity at the time the will was executed; and therefore, Contestant did not meet the burden of proof cast upon him by the introduction of Proponents' proof.

"(a) It is reasonable to presume, and it is a presumption of law, that Contestant would have presented better evidence if it was to be had.

"(b) The opinions of the expert witness upon partisan, incomplete and incorrect hypothetical statements of the same evidence did not give force to such incompetent matters, and such opinions did not have as much support or value as the verdict upon the whole evidence had, the opinions being as incompetent as those parts of the evidence upon which they were based and as erroneous as were the incorrect hypotheses.

"(c) Incompetent evidence is no evidence and is not effective whether objected to or not.

"(d) Peculiarities do not show testamentary incapacity.

"(e) Old age creates no presumption of testamentary incapacity. Testatrix was less than 70.

"(f) If mental weakness—instead of keenness of mind—had been shown, it alone would not have incapacitated testatrix.

"(g) If a fitful or temporary mental disorder of any consequence had been shown, it would not have been presumed to continue.

"(h) Presumptions of the continuance of insanity, when they arise, are presumptions of fact and not law.

"(i) Presumptions obtain only in the absence of evidence and vanish when evidence on the point is presented.

"(j) A suggestion—even proof—that a testatrix did not have actual knowledge of the nature and extent of her property, etc., is unavailing, it being necessary to show that she did not have capacity to know the same. Many sane people do not know all the facts, or the law, respecting their property."

It is true that none of the witnesses who testified as to the statements and conduct upon which their opinions of her mental unsoundness at the time the will was executed was based had seen Mrs. Grainger a year or more before she executed the will and never saw her thereafter. But her statements made shortly before she left for California, which we have before set out, and her letters written after she reached California, evidence her continued delusions as to her husband's treatment and enmity for her, and in regard to her ownership of all their community property, with which she became obsessed before she left home. This was the primary reason, according to her statements made shortly before she left home, of her going to California. The following statements in her letters written from California show that these delusions remained with her in undiminished, if not increasing, force up to the time of her death: In one of her letters written to her friend Mrs. Stone in May, 1926, she says: "I am not extravagant—have never been or I wouldn't have anything today and have risked my life on more than one occasion by firmly refusing to jeopardize that."

In another letter written to Mrs. Stone on October 25, 1925, she says: "Of course C. J.

G. would say I must be there (in Palestine) or lose the case (referring to a suit against Mr. and Mrs. Grainger to recover for paving done in front of their Palestine homestead) because he wants me to have to go back there whether or no."

And in another portion of this letter she wrote as follows: "I hope you will be able to see California in the Spring—I may see you before that—but if I live—I will be there when you are ready to come. I say 'if I live' advisedly—because I have the feeling that if I return to Texas—I will not live to return here. There is more than one reason for that thought."

A third letter written to Mrs. Stone on August 22, 1926, contains these statements: "I couldn't think of financing anything or anybody (to the extent of financing some one for medical education)—being robbed as I am of every dollar of my income both present & prospective—the time may come when I won't be able to finance myself—without going through a process of law to get control of what belongs to me—it would probably mean a long drawn out battle forcing me to go there & stay from one term of court to another or make repeated trips back & forth for years probably which would be done to make it as hard for me as possible—just for spite because I have come away from unbearable conditions there—& remained away—feeling that if I value my life—I must continue so to do. The only reason he has not taken the initiative himself & put his threats into effect—is because he is making money by not doing so—he is taking advantage of that d—— Texas law giving the husband the handling of his wife's property & not compelling him to turn the income over to her—why even in community property the wife is entitled to half the income! I have been here three years—& received a part of the rent from the farm one year—that is all & I do not expect to get another dollar."

And in another part of that writing Mrs. Grainger used the following language: "Why Mary he has no grievances. The grievances are all mine—be assured of that though I have never told them to the world. They are many & very serious. I could write you an epistle on that subject—but I do not feel equal to it—at least not today—I was not able to finish this letter when I started it & I am still far from well."

And in the same writing Mrs. Grainger used the following language: "One year since I have been here I received a part of the rent due for that year & nothing since & probably will not. It is a case of 'your money or your life.' While I remain here I will probably receive no money but I have my life—temporarily at least. If I go back there I can't count on my life at all—then of what use—even money? A sorry outlook isn't it?"

If the jury, as we must assume it did, believed under the evidence showing appellee's never-failing fidelity and consideration for the comfort and welfare of his wife, and that the property accumulated by them after their marriage was in the main, if not entirely, acquired by community funds derived from his earnings, and was placed in her name under an agreement between them, as stated by Mrs. Grainger, that no will would be made by either of them, in order to protect Mrs. Grainger from any claim by his heirs to any portion of the property in event he should die before she did, the unnatural and unreasonable discrimination against appellee in her disposition of this accumulation of property largely, if not wholly, from the earnings of appellee, is of itself a circumstance which, taken in connection with her verbal statements and those contained in her letters above quoted, would authorize the jury to find that at the time she made her will she was under the insane delusion that appellee was trying to rob her of her property and, if necessary to accomplish this purpose, would take her life.

We think the evidence upon the issue of insane delusion at the time of the execution of the will not only raises that issue as to the mental capacity of testator at the time the will was executed, but is amply sufficient to sustain the jury's finding upon the issue of mental capacity. We have set out at some length the testimony of the expert witness, Dr. Johnson, because it so clearly presents the progressive character of insane delusions and their progressive operations upon the mind so diseased. As shown in the testimony of this expert, the mind so diseased may be perfectly normal and function with logical and reasonable precision upon all subjects except those affected by the insane delusion.

We think the facts clearly and amply sustain and illustrate this expert opinion.

It is well settled that an insane delusion in regard to one who would be a natural object of the testator's bounty will destroy the will on the ground of mental incapacity. Rogers v. Fleming (Tex. Com. App.) 3 S.W. (2d) 77; Snell v. Weldon, 243 Ill. 496, 90 N. E. 1061; Burkhart v. Gladish, 123 Ind. 337, 24 N. E. 118; Albrecht v. Hittle, 248 Ill. 72, 93 N. E. 351; Buford v. Gruber, 223 Mo. 231, 122 S. W. 717; Hardenburgh v. Hardenburgh, 133 Iowa, 1, 109 N. W. 1014; Matter of Soden's Will, 38 Misc. 25, 76 N. Y. S. 877.

We think the charge of the court sufficiently instructed the jury upon the only issue submitted to it, and none of the propositions complaining of error in the charge should be sustained.

The remaining propositions, which complain of the hypothetical question asked the expert on the grounds that all of the evidence as to the mental capacity of the testatrix was

not included in the question, and that some of the facts contained in the question upon which the expert's opinion is based were immaterial, cannot be sustained. All of the material facts upon the issue of insane delusion were contained in the question. The only character of mental capacity raised by the evidence was that of insane delusion, and it was only necessary to include these facts, since it was admitted that, upon all other subjects than that upon which insane delusion was based, the testatrix' mind was normal. The immaterial facts stated in the question were clearly not considered by the expert in reaching his conclusion as to the insane delusion, and could not have influenced the jury in arriving at their verdict.

We think the judgment of the trial court should be affirmed, and it has been so ordered.

Affirmed.