## GARCIA et al. v. GALINDO.
### No. 11608.

Court of Civil Appeals of Texas.
San Antonio.

July 3, 1946.

Rehearing Denied July 31, 1946.

Perkins & Floyd, of Alice, and J. W. Wilson, of Falfurrias, for appellants.

Lloyd & Lloyd and Homer E. Dean, Jr., all of Alice, for appellee.

NORVELL, Justice.

This is a will contest. The testator, Daniel Garcia, made a will in which he left all of his property to his younger brothers, Manuel and Adolfo Garcia. Probate of the will was contested by Fidela Garcia de Galindo, wife of Rodolfo Galindo and a daughter of the testator, Daniel Garcia.

Upon a former appeal of this case (189 S.W.2d 12), we held that the verdict of the jury was against the overwhelming preponderance of the evidence. The record indicated that the case had not been fully developed and for this reason we remanded the cause for new trial. In view of this action, it was unnecessary for us to pass upon the contention that there was "no evidence" supporting the verdict of the jury. A point of "no evidence" raised a question of law and when sustained, a rendition of judgment will ordinarily, although not necessarily be ordered by the reviewing court. Texas Employers' Ins. Ass'n v. Herring, Tex.Com.App., 280 S.W. 740.

Upon the present trial the finding of the jury was again favorable to Fidela Garcia de Galindo, the contestant.

The sole issue of testamentary capacity was submitted to the jury as follows: "Do you find from a preponderance of the evidence that Daniel Garcia, at the time he executed the will which has been offered for probate as his last will and testament, had testamentary capacity?"

In connection with this issue, the trial judge gave the following definition of testamentary capacity: "By the term 'testamentary capacity' is meant that the person making the will must, at the time the will is executed, have sufficient ability to understand the business in which he is engaged, the effect of his acts in making the will, the capacity to know the objects of his bounty and their claims on him and the general nature and extent of his property."

Upon a negative finding of the jury, the trial court refused probate of the will.

Appellants' primary contention here is that the jury finding is supported by "no evidence" and consequently their motion for a peremptory instruction or motion for judgment non obstante veredicto should have been granted.

We think it well at the outset to set forth certain general rules having application in determining a point of "no evidence," particularly in will contest cases.

It is well settled in Texas that more than a scintilla of evidence is necessary to raise a fact issue for a jury. The leading Texas case upon this point is Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063, in which Mr. Justice Denman, speaking for the Supreme Court, said: "From a careful examination of the cases, it appears (1) that it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force. If it so determines, the law presumes that the jury could not 'reasonably infer the existence of the alleged fact,' and 'that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.' The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his liberty, or his life upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining as a question of law whether the testimony establishes more."

As to will contests, this Court has uniformly followed the rules set forth in Navarro v. Garcia, 172 S.W. 723, 724, wherein Chief Justice Fly said:

"The burden rested upon the proponent of the will to show that the testatrix was of sound mind at the time that she executed the will. Article 3271 (now Art. 3348), Rev.Stats. There is no such presumption of sanity in Texas, although there is in other states, in the case of a maker of a will, as in the case of the maker of deeds or other ordinary contracts. The formal burden of proof in trials on the probate of wills, whether in the county court or on appeal to the district court, is upon the executor or other person proposing the will for probate. Beazley v. Denson, 40 Tex. 416.

"The owner of property has the absolute right to dispose of his property as he may desire, and the fact that the disposition of the property was not made to a blood relative, but to one not related by blood or marriage to the maker of the will, would not, standing alone, be sufficient to justify a refusal to probate the will. While the fact that the relatives were disinherited in favor of some one not related might be a circumstance, which, taken with others, might show unsoundness of mind or undue influence, yet, standing alone, it could not justify a verdict against the probate of the will. 'Wills are not to be probated solely upon the ground that the disposition which a testator may make of his property seems to a court or jury a natural and proper disposition, nor are they to be refused probate because to the court or jury the disposition of the property may seem to be improper or unnatural.' Vance v. Upson, 66 Tex. 476, 1 S.W. 179.

"The state of mind of a testator at the time of the execution of the will must be made the test of sanity, and the state of mind at other times can have no probative force, except as it may tend to show the state of mind of the testator at the time of execution of the will. *By the proof introduced by appellant a prima facie case for probate of the will was made out, and unless that case was destroyed by the evidence introduced by the contestants, the will should have been probated.*"

We have italicized, for the purpose of emphasis, that part of the opinion relating to the proponent's "prima facie case," as it is of controlling importance here.

Turning now to the facts, it appears that Daniel Garcia was about seventy-five years old at the time of this death, which occurred on July 27, 1944.

He had been married two times. The appellee is a daughter of his first wife, but she did not remember her mother. Appellee was not reared by her father, but lived with a grandmother and later an uncle, until she married Rodolfo Galindo, in 1936. Apparently, the only time she ever lived with Daniel Garcia was from some time in 1940 until September of 1942.

Some ten to fifteen years before his death, Daniel Garcia lost his sight. His blindness was preceded by months of violent pains in the eyes and a considerable amount of physical and mental suffering.

In 1937, his second wife and a nephew whom he had reared as a son, died. These deaths occurred within six weeks of each other.

After his second wife's death he continued to live in the house with certain nieces of the second wife until some time in 1940, when he requested appellee and her husband to come and live with him. In September of 1942, Daniel Garcia became dissatisfied with this arrangement and went to live with his brother, Adolfo Garcia. The will involved was executed on December 28, 1942.

Appellants presented a prima facie case for probate which was exceptionally strong. As pointed out in our former opinion, the will was signed in the presence of four attesting witnesses, three of whom testified upon this trial as well as the former trial.

The will was prepared by Mr. G. C. Mann, a practicing lawyer of Laredo, Texas. According to his testimony, Mann had known Daniel Garcia since 1926, and had represented him as an attorney at law in four or five transactions. Daniel Garcia came to his office on at least two occasions with reference to the will. As he was blind, he was accompanied by one or more of his brothers. Daniel Garcia personally gave him the instructions concerning the will. He made it plain that he did not want any of his property to go to his daughter. The will offered for probate is the will which Mann drew in accordance with the instructions of Daniel Garcia. Mann made the suggestion that four, instead of two, attesting witnesses be provided for, one to be a lawyer and the other a doctor.

As to Daniel Garcia's mental condition at the time of these conferences with reference to the will, Mann testified:

"Q. I will ask you whether or not Daniel Garcia was, in your opinion, of sound mind? A. In my opinion he was definitely of sound mind.

"Q. Was his mentality average or above the average for a man of that age? A. Above the average. His mind seemed to be as clear as a bell to me."

The will was signed and attested at Falfurrias, Texas, under the supervision of Mr. J. W. Wilson, a practicing attorney of that city.

The testimony relating to the actual publication of the will was substantially the same as that given upon the former hearing and discussed in our opinion, reported in 189 S.W.2d 12, and need not be repeated. It is sufficient to say that the testimony of Mr. G. C. Mann, the three attesting witnesses and Miss Manuela Lopez (now Mrs. Manuela Gonzalez) made out appellants' prima facie case.

In addition to Dr. De Hoyos, who was an attesting witness, two other physicians testified for appellants. Dr. Glenn Bartlett testified that he had acted as personal physician for Daniel Garcia while he lived with Rodolfo and Fidela Galindo and also while he lived with Adolfo Garcia. He attended Daniel Garcia during his last illness, and testified as follows, without objecton:

"Q. Based upon your observation of him and treating him as a physician, I will ask you whether or not during the time you knew him, if he was of sound mind? A. I think his mind was as sound as any man of his age and blindness.

"Q. Based upon your observation of him, and examination of him, I will ask you whether he had mental capacity sufficient to transact business? A. Yes, sir.

"Q. I will ask you whether or not in your opinion he knew what property he owned? A. Yes, sir.

"Q. And what he desired to do with it? A. Yes, sir.

"Q. Or what the effect of a written instrument was? A. Yes, sir."

492

Dr. Jose G. Garcia testified that he was a cousin of Daniel Garcia and has acted as his physician; that he saw Daniel Garcia during the latter days of his life and a few days before his death. The doctor testified, without objection, as follows:

"Q. Based upon your experience as physician, and your knowledge of him, state whether or not he was of sound mind? A. Every time that he talked to me his mind was in very good condition.

"Q. In your opinion, doctor, did he have sufficient mental capacity to transact business? A. I think so.

"Q. Do you think he had sufficient capacity to make a will in December, 1942? A. I think so. I saw him before and I saw him after that."

Appellants also placed upon the stand a number of lay witnesses who had known Daniel Garcia during the time he lived with Rodolfo and Fidela Galindo and with his brother Adolfo. They related certain conversations and transactions with him and expressed the opinion that Daniel Garcia was of sound mind.

It is undisputed that Daniel Garcia and the appellee had a lawsuit which was finally settled in 1944. During the course of this litigation there seems to have been no suggestion made that Daniel Garcia was of unsound mind and unable to conduct his legal and business affairs.

■ While the establishment of a prima facie case of testamentary capacity does not shift the burden of proof in the sense that it becomes incumbent upon a contestant to prove, by a preponderance of the evidence, that the testator lacked testamentary capacity, it does have the effect of passing the burden of proceeding with the evidence to the contestant.

■ It is a rule of general application that "Testimony which stands uncontradicted must be accorded verity and taken as true if it is not inherently improbable. A jury have no right to ignore uncontroverted evidence which comes to them with no suspicion attached to it, and render a verdict contrary thereto, or to deny proper weight to undisputed facts which have no suspicion cast upon them, or,

again, to reject arbitrarily the testimony of witnesses against whom there is no discrediting fact or circumstance." 17 Tex. Jur. 901, § 406.

It will therefore be seen that had the case ended after the presentation of appellants' prima facie case the verdict would have gone to proponent upon a peremptory instruction. In order to determine whether or not contestant has brought forward any evidence having a reasonable tendency to destroy or rebut proponent's prima facie case, it is necessary to examine appellee's evidence in some detail.

No attempt at impeachment of appellants' attesting witnesses was made. Further, no attempt was made to show that the lawyer who drew the will or the witness who translated the same from English into Spanish were other than what they appeared to be, wholly disinterested witnesses.

■ While in so far as conflicts in the evidence are concerned, we must consider the evidence most favorably for the judgment, the probative force of a litigant's evidence which is relied upon to produce a conflict must do more than raise a mere suspicion or surmise of the existence of factual circumstances contrary to those presumably established by the prima facie case of his opponent. Texas Employers' Association v. Herring, Tex.Com.App., 280 S.W. 740.

So, here the question may be stated: Does appellee's testimony do more than produce a mere suspicion that Daniel Garcia did not possess testamentary capacity on December 28, 1942, so that it may be said that there is a substantial conflict of evidence upon the issue?

With this in mind, we examine the evidence relied upon by appellee.

Mr. Juan V. Gonzalez, a deputy tax collector of Jim Wells County, testified that he had known Daniel Garcia for forty-one years. In his opinion, Daniel Garcia was of unsound mind when he was living with Rodolfo and Fidela Galindo (1940–September, 1942). This opinion seems to be based primarily upon two incidents related by the witness.

"One day he (Daniel Garcia) called me into his house and he told me that he had received a telephone call from Realitos that my sister had died in Realitos, and I went right back and my people lived in Rio Grande City, and some in Weslaco, and Kingsville, and I went and telephoned all of my people, Weslaco, Kingsville, and here and I gathered them all up from what he told me and we went out. It took me nearly all night to go to Realitos on the ranch and when we got there late, about four o'clock, when we got to the ranch, into the gate, we found my sister outside the house. My wife was crying, and my sister was crying; we were taking some flowers with us. We thought that she was dead. When we got there it surprised us all that she was alive. She is still living, yet. * * · *

"I came back and asked him (Daniel Garcia) who told him that, and he said that he was sorry if he had told me that as he did not get that telephone call."

Upon cross-examination, the witness placed the time of the occurrence of this incident as 1935 or 1936, but also stated it was after Daniel Garcia's second wife had died (1937), but before Rodolfo and Fidela came to live with him. The witness did not know whether or not Daniel Garcia had a telephone and did not know how Daniel Garcia was supposed to have gotten the message. He finally said it might have been a telegram that Daniel Garcia said he received.

Another incident was related by this witness. "He (Daniel Garcia) was outside on the porch, I would notice that he was crying. I did not notice what was the matter. He finally told me 'I want you to go to Ascension Perez and get me an address,' and I said 'an address of what,' and he said 'I heard some friend of mine in Laredo was dying.' I went on down to get the address and when I got back he was all right. I told him about the address, and he did not seem to care about it or remember it when I came back."

The time of this related occurrence was rather indefinite. It seemingly occurred shortly after the telephone incident.

The witness further testified that "sometimes he (Daniel Garcia) commenced one thing and in a little while he would make a difference in what we were talking about." When asked to tell the jury in detail why he said Daniel Garcia was of unsound mind, the witness replied: "Those different occasions that I talked to him, and him making me travel all night and coming back to his house and asking him about the death of my sister. You can see it clear, and you can see a man and see the difference. You see a man with his head right and a man that was drunk. I think anybody could see a difference like I did with him."

This witness testified that he did not see Daniel Garcia after he moved to the house of his brother Adolfo. He went to Adolfo's house one time with some assessment blanks, but Adolfo Garcia said he would get them fixed up and witness did not get to see the testator.

The witness Ameliano Galindo testified that he had known Daniel Garcia about twenty years. That after the death of his wife and boy he noticed a change in Daniel Garcia. "He would say one thing now and then change and say another thing, and then he would start to cry." Witness had seen Daniel Garcia crying two or three times. His wife and foster son both died within the space of about a month. When he lived with Rodolfo and Fidela "sometimes he would get 'bothersome.' Sometimes he would say it was night when it was during the day. * * * At the time he lost his wife and soon after he was out of his mind—sometimes he was out of his mind. * * * He would start to talking and then he would quit talking and go —go to the toilet and come back. * * * He would start talking about one thing and he would commence talking about another. * * * He would start shaking his head, moving his head." After his brother Adolfo would visit him, "he would go to crying and he would say that Mr. Adolfo would try to get him to do things that were very hard."

Although this witness was not very specific or detailed as to visits with Daniel Garcia after he moved to Adolfo's house, he did say that he had seen him at Adolfo's

house and that he "was shaking his head and talking to himself," and that in his opinion Daniel was insane while a. Adolfo's house.

Vincente Lopez testified that he had known Daniel Garcia for twenty or twenty-five years. That he talked with the old man several times. It is not clear when these conversations took place. The testator called him Vincente Guerrero, while his name was Vicente Lopez. This witness said: "In my opinion you could not depend on Daniel Garcia as he varied so much in his mind."

Raul Martinez testified that he had known Daniel Garcia since 1917, and worked for him as a chauffeur. He noticed a difference in Daniel Garcia's condition after the death of his wife and son. "He was nervous and upset. He would cry very much and start saying one thing and then change. He was not like he used to be. * * * He was not in his senses like he was before." Witness had visited Daniel Garcia while he was living with Rodolfo, "but he was not conversing right."

Estevan Garcia testified that he had known Daniel Garcia since 1926. The witness stayed with the old man and nursed him for eighteen days, day and night, during a sick spell, while he was living with Rodolfo and Fidela. During this time, according to the witness "Sometimes he was conscious and sometimes unconscious." When asked what he meant by "conscious and unconscious," the witness replied: "Sometimes he was correct in his acts and deeds and sometimes he was not. * * * Sometimes it (his mind) was right and sometimes it was not right." The witness testified that he had seen Daniel Garcia after he had moved over to Adolfo's house. As to his mental condition then, the witness testified as follows:

"Q. In your opinion, from what you saw of Daniel Garcia while he was at his brother's house, and from what you saw of him in the past, at that time was he sane or insane? A. He was unconscious.

"Q. What do you mean by unconscious? A. That he was not correct in his deeds or in what he would say. Sometimes he would say one thing and then another."

Raul Munoz testified that he had visited Daniel Garcia and that "he was blind and desperate sometimes. * * * He would talk with me about his sickness (being) blind and pain on his eyes. * * * He said he suffered."

Sam Garcia testified that he had seen Daniel Garcia several times while Rodolfo and Fidela were living with him. "He would talk sometimes and would want to know what the news was, and sometimes he would go to talking about things I knew that he imagined. One time he would talk like somebody was trying to kill him; that somebody had come there and he had felt somebody around his bed and he knew somebody was trying to kill him, and I knew from my own knowledge that he was just imagining things."

This witness also testified that he saw Daniel Garcia one time while he was living with his brother Adolfo. "He was sick at that time. That was just four or five days before they took him to San Antonio (where he died, in 1944). He did not talk much then. He looked like he was worse and sick."

As to his opinion of the mental condition of Daniel Garcia at the time he lived with Rodolfo and Fidela and the time witness saw him at Adolfo's house, Sam Garcia testified as follows:

"Q. In view of the question, was he sane or insane? A. Well, I do not say that he was insane but he was not in his right mind.

"Q. He was not in his right mind? A. No, sir.

"Q. During the time that you knew him was he able to transact any business to amount to anything? A. I would not think that he was.

"Q. Was he helpless or could he get about? A. No, sir, they had to carry him around. They had to have somebody to take him wherever he wanted to go."

The space of time which is of primal consideration upon this inquiry is that closely preceding and including December 28, 1942, the date of the publication of the will.

We have heretofore set out what was said relative to this matter in Navarro v.

Garcia, Tex.Civ.App., 172 S.W. 723. In 44 Texas Jurisprudence, § 49, it is stated that "the issue as to whether the decedent was or was not competent or capacitated to make a will is to be determined in view of the showing as to his condition at the time of the execution of the propounded instrument. * * * While proof tending to show insanity at another time than that of execution of the instrument is relevant and admissible, and the contestant is entitled to have the jury pass upon its weight, yet, where the persons who were present at the time when the writing was executed have testified that the decedent appeared to be sane and was informed as to the contents of the script, no importance attaches to evidence as to his condition at other times."

In the early case of Vance v. Upson, 66 Tex. 476, 1 S.W. 179, the Supreme Court said: "Where the probate of a will is contested on the ground of the testator's insanity, there is but a single issue,—mental capacity,—and the true inquiry is as to the testator's mental condition at the precise time when he executed the instrument sought to be probated."

In this case there is no evidence from which it could be reasonably concluded that Daniel Garcia was suffering from some specific disabling mental disease, which would make it impossible for him to have been possessed of soundness of mind or testamentary capacity at the time of the execution of the will. The record here differs substantially from those considered by us in Adamson v. Burgle, 168 S.W.2d 388 (dementia praecox) and South Texas Investment Company v. Harrison, Tex.Civ.App., 194 S.W.2d 587 (senile dementia). Consequently, from the showing of an unsettled condition of mind at one time, it does not necessarily follow that such condition persisted and was present at a later time when the will was executed. It may be granted that with the aged any physical or mental impairment may be expected, in the light of human experience, to continue for a greater period of time than it would in the case of a younger person, yet, it can hardly be said that the testimony of Juan Gonzalez as to the alleged telephone incident of 1937 (or some prior year) conflicts with the testimony of witnesses who swore that Daniel Garcia was of sound mind on or about December 28, 1942. The testimony of this appellee's witness and the attesting witnesses may be reconciled. The testimony relating to the telephone incident is remote as to time, and for that reason its probative effect as tending to establish mental incapacity at the time of the execution of the will is correspondingly weakened. Burgess v. Sylvester, Tex.Civ.App., 177 S.W.2d 271, affirmed 143 Tex. 25, 182 S.W.2d 358. It is also our opinion that evidence tending to show an unsettled state of mind on the part of Daniel Garcia immediately after he sustained the double blow of losing his wife and foster son, or while he was sick for eighteen days and nursed day and night by Estaven Garcia, or while he was suffering from his last illness, can not properly be regarded as substantial evidence of a lack of testamentary capacity on December 28, 1942. An unsettled mental condition at such times and under such circumstances does not constitute such a departure from usual or general experience as to suggest mental derangement of a permanent or lasting nature.

Furthermore, "little, if any, probative force (is given) to testimony tending to show that the testator had said and done things as the result of mere idiosyncracies to which old people unfortunately often fall heir, * * *. Imperfect memory, caused by sickness or old age, forgetfulness of the names of persons a testator has known, idle questions or statements, or requiring a repetition of information, will not be sufficient to establish incompetency," nor to contradict substantially a prima facie case of testamentary capacity made out and established by unimpeached disinterested witnesses. McCannon v. McCannon, Tex.Civ. App., 2 S.W.2d 942, 944. Much of appellee's testimony comes within this classification.

It has also been held that the mere statement of a lay witness that a testator was of "unsound mind" is insufficient to raise a jury issue of testamentary capacity. Cameron v. Houston Land & Trust Co., Tex. Civ.App., 175 S.W.2d 468. As to opinions of lay witnesses, see 24 Tex.Jur. 430, § 45.

Daniel Garcia lived with his brother Adolfo from September, 1942, until his death, in 1944. It was during this period that the will was executed. Also, as to this period appellee's testimony is particularly vague and uncertain as to time. For instance, the witness Ameliano Galindo testified that he saw Daniel Garcia at his brother's house, "shaking his head and talking to himself." The record does not disclose whether this occurrence took place a day, a week, or a month before the will was executed, or a day, a week, or month before Daniel Garcia died. Yet, to sustain appellee's case, the conclusion of insanity must be based upon this reported behavior, and the assumption then made that this disability was operative on December 28, 1942. The issue in this case is testamentary capacity, and "It is the rule ordinarily that less mental capacity is required to enable a testator to make a will than for the same person to make a contract." Rudersdorf v. Bowers, Tex.Civ. App., 112 S.W.2d 784, 789.

We hold that the testimony of appellee's witness is insufficient as a matter of law to raise the issue of lack of testamentary capacity on the part of Daniel Garcia at the time he executed and published his last will and testament. The trial court should therefore have peremptorily instructed the jury to find for the appellants as proponents of the will.

Although this case was not submitted to the jury upon a special instruction as to "insane delusions" (Rodgers v. Fleming, Tex.Com.App., 3 S.W.2d 77), appellee suggests that the evidence supports the theory that Daniel Garcia was suffering from an insane delusion that his daughter had mistreated him; that this delusion affected the testamentary disposition he made of his property and consequently destroyed his testamentary capacity.

It is undisputed that there was ill feeling between the father and daughter. They engaged in a lawsuit over property in 1944. When Daniel Garcia gave instruction as to the preparation of the will, he made it very clear that he did not wish his daughter to share in the property.

The evidence upon which appellee seems to rely, primarily, is that Daniel Garcia complained that his daughter upon one occasion had "pushed him down," so that he evidently fell upon the floor. Appellee was precluded from testifying by reason of Article 3716, Vernon's Ann.Civ.Stats. Evidence relating to this incident is, consequently, vague and indefinite. Appellee produced witnesses who testified that when they visited the home of Daniel Garcia while Rodolfo and Fidela were living with him, the daughter treated her blind father with kindness and consideration. On the other hand, certain of appellants' witnesses testified that the daughter evidenced a cold and unfeeling attitude toward her father.

The following is an excerpt from the cross-examination of Dr. Glenn Bartlett, appellants' witness:

"Q. If in fact Mr. Daniel Garcia stated that his daughter had pushed him down, and that he suffered grief from that, and if it was not true that she pushed him down, and that was a mere idea that he had in his head, or thought, what would that indicate of his mental condition toward his daughter? Would it indicate some type of psychosis? A. It might indicate some mania of persecution.

"Q. And if he had a 'mania of persecution' would that indicate a type or state of mind? A. To some extent, yes.

"Q. And his attitude would or might cause him to act abnormally toward that person? A. Yes, sir, if a man had a mania it would cause them to act.

"Q. It could cause Daniel to refuse to make a will in favor of his daughter and leave his property to his brothers? A. If he had a mania of persecution, yes."

In our opinion, the theory of "insane delusion" is supported only by surmise and guess work. Dr. Bartlett's answer to the hypothetical question indicates a mere possibility at most, and the hypothesis upon which the question is based lacks substantial support in the testimony. "A delusion, to deprive the testator of capacity, must be an insane delusion. * * * A mere mistaken belief or an erroneous or unjust

conclusion is not an insane delusion, if there is some foundation in fact or some basis on which the mental operation of the testator may rest, even though the basis may be regarded by others as wholly insufficient." 68 C.J. 433, § 30.

Sane men commonly act in most important matters upon their likes and dislikes of persons, although such likes and dislikes may seem strange and ill-founded to others. The mere fact that Daniel Garcia in his blinded condition may have arrived at the conclusion that he was not properly treated by his daughter and that upon one occasion she was responsible for his falling upon the floor, is hardly sufficient to conclude that he was suffering from an insane delusion. There is one element absent from this case that is usually present in most cases where insane delusions have been held to deprive a person of testamentary capacity, and that is a history of long continued affection and regard by one person for another which is suddenly terminated and replaced by violent hatred. Such was the case in Stone v. Grainger, Tex.Civ.App., 66 S.W.2d 484, relied upon by appellee. In this case the daughter, Fidela, seemingly never lived with her father until after she was grown and married. After living with his daughter for two or three years, the old man decided he didn't like it and left. Insane delusions are exceptional and extraordinary in human experience and the facts of this case do not point to their existence as an explanation of Daniel Garcia's conduct. Generally, persons harboring personal dislikes are not suffering from insane delusions. We can not accept surmise of the unusual when the usual or ordinary suffices. We conclude that the question of insane delusions is not in the case. 44 C.J. S., Insane Persons, § 2, p. 6; 68 C.J. 433, § 30; 28 R.C.L. 102, § 54; Purdy's Adm'r v. Evans, 156 Ky. 342, 160 S.W. 1071; Kell v. Ross, Tex.Civ.App., 175 S.W. 752; Annotations: 27 L.R.A.,N.S., 62, L.R.A. 1915A, 458.

Appellee also emphasizes the fact that Daniel Garcia by his will disinherited his daughter.

We think that which was written by Chief Justice Fly of this Court, in Stolle

v. Kanetzky, 220 S.W. 557, and Salinas v. Garcia, 135 S.W. 588, is applicable upon this point: "It is highly probable that the fact that Mrs. Kanetzky was an only daughter, who had labored hard for her parents, had an influence upon the minds of the jury. It is the common idea that every child has the right to some of the property of the parents upon their decease, and the mere fact alone that a child is disinherited often exerts a potent influence over the minds of an average jury. But that is not the law in this state. Each and every citizen of Texas has the absolute right by his testamentary bequests to dispose of his property regardless of the ties of nature and relationship, and in defiance of the rules of justice or the dictates of reason 'and no sentimental considerations of love and affection that should actuate a man in dealing with his own blood can be decisive as to the validity of a will that has been executed by a person possessing testamentary capacity and without undue influence.'" Stolle v. Kanetzky, Tex.Civ. App., 220 S.W. 557, 559.

"Mental and physical decay do not keep step with each other, and, after a man has become impaired in all the five senses, he may retain intelligence sufficient to enable him to understand and prepare for the testamentary disposition of his property. It is often the case, when a man has outlived his generation, and exists on memories of the past, when the blighting hand of decrepitude and decay is laid upon him, when 'life's shadows are meeting eternity's day' and the end is near, that those about him will forget and 'shut their doors against a setting sun,' and the only weapon of defense that he has against such wrong and neglect are the possessions that he has gathered and laid away for just such a day. As said by the great Chancellor Kent in Van Alst v. Hunter, 5 Johns, Ch., N.Y., 148: 'The control which the law still gives to a man over the disposal of his property is one of the most efficient means which he has in a protracted life to command the attention due to his infirmities. The will of such an aged man ought to be regarded with great tenderness.' And in the case of Sloan v. Maxwell, 3 N.J.Eq. 563, the court said: 'The power of disposing of prop-

erty is an inestimable privilege of the old. It frequently commands attention and respect when other motives have ceased to influence. How often, without it, would the hoary head be neglected, deserted and despised.' It is indeed a sad commentary upon humanity that when filial love has failed, and gratitude and devotion have passed away, the fear and awe inspired by the power of testamentary disposition of property becomes the 'shadow of a rock in a weary land,' and will insure the greatest respect and most devoted attention. Except in extreme cases of imbecility, the aged and decrepit should not be deprived of this last defense against ingratitude and base neglect." Salinas v. Garcia, Tex.Civ. App., 135 S.W. 588, 590.

The judgment appealed from is reversed and the cause remanded to the District Court with instructions to render judgment admitting the will of Daniel Garcia to probate, and to certify said judgment to the County Court, as provided for by Rule 335, Texas Rules of Civil Procedure.

Reversed and remanded with directions to render judgment.

MURRAY, Justice (dissenting).

I find myself unable to concur in the majority opinion of this Court and, therefore, respectfully hereby declare my dissent thereto.

The jury in this case found from the evidence before them that Daniel Garcia did not have "testamentary capacity" at the time he executed the proffered will.

The question here is, Was there sufficient evidence to support this negative finding?

The burden of proof was unquestionably upon the proponents of the will to show, by a preponderance of the evidence that Daniel Garcia did have such "testamentary capacity." Art. 3348, Vernon's Ann.Civ. Stats.; 44 Tex.Jur. p. 571, § 31. There is no question of preponderance of the evidence involved. Buchanan v. Davis, Tex. Civ.App., 300 S.W. 985, affirmed Tex.Com. App., 12 S.W.2d 978. The question of testamentary capacity is ordinarily one of fact for the jury. Payne v. Chance, Tex. Civ.App., 4 S.W.2d 328.

It would therefore seem that if contestants offered evidence, upon the hearing, amounting to more than a scintilla of evidence, tending to show the want of testamentary capacity on the part of Daniel Garcia, then the jury finding should not be disturbed. Or, to express it differently, a judgment in favor of contestants will not be disturbed where there is evidence of material and substantial value tending to show want of testamentary capacity. Whitney v. Murrie, Tex.Civ.App., 264 S. W. 270.

As I view the evidence in this case, there is evidence of material and substantial value tending to show want of testamentary capacity on the part of Daniel Garcia at the time he executed the alleged will.

Daniel Garcia was an old man, seventy-eight years of age at the time of his death. The will was executed some three years prior to his death, at which time he was weak and feeble. He had been blind for some fifteen years. He had been married twice and both wives and his only son had preceded him in death. The sole remaining member of his family was his daughter, Fidela Garcia de Galindo, and by his purported will he disinherited her.

He falsely believed some one was trying to kill him, that his daughter had mistreated him and had pushed him down. These facts and other instances of a distorted mind caused at least seven witnesses, who knew him intimately for many years, to testify that Daniel Garcia was of unsound mind at the time the will sought to be probated was executed.

I shall not here attempt to review all the testimony given in great detail by the witnesses, as I believe the above statement is sufficient to demonstrate that there was substantial testimony tending to show that Daniel Garcia did not have testamentary capacity to execute a will.

There is sufficient evidence if believed by the jury, and it was evidently so believed, to show that Daniel Garcia was suffering under an insane delusion to the effect that his only daughter had mistreated him and shoved him down, when in

truth and in fact she had always treated him with loving kindness and had never mistreated him. It was this insane delusion that prompted him to execute an unnatural will and disinherit his only surviving child. Such an insane delusion in itself has been held to show a lack of testamentary capacity. Stone v. Grainger, Tex. Civ.App., 66 S.W.2d 484.

It is my opinion that the judgment of the trial court should be affirmed.